IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

JOHN NEIGHORN,

                                                    Case No. 1:10-cv-03105-CL

                    Plaintiff,

          v.

                                                    **ORDER**

QUEST HEALTH CARE and
ROTECH HEALTHCARE, INC.,

                    Defendants.

CLARKE, Magistrate Judge.

    This matter comes before the court on defendants' motion (#40) for summary judgment.

For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

    Plaintiff John Neighorn ("Neighorn") filed this action on September 30, 2011, against

defendants Quest Health Care ("Quest") and Rotech Healthcare, Inc. ("Rotech") (collectively,

"Rotech")[1] alleging claims for retaliatory discharge in violation of the False Claims Act

("FCA"), 31 U.S.C. § 3729, *et seq.*, and Oregon's whistleblower statute ORS § 659A.199;

violation of ORS § 652.750 for failing to provide him a copy of his personnel file; and a claim

for common law wrongful discharge.

---

[1] Neighorn alleges Rotech does business as Quest and Centennial Medical Equipment, Inc., and
that Quest and Rotech acted as his joint employers.

## I. Rotech

As its primary business, Rotech provides respiratory services, including the delivery of oxygen to patients' homes and the set up and maintenance of related equipment, as well as products and services for sleep apnea, such as CPAP and BiPAP devices. (Am. Compl., Dckt. # 72, ¶ 3; Defs' Corrected Mem. Supp. Mot. Summ. J. ("Defs' Corr. Mem."), Dckt. # 51, pp. 2). Rotech provides these services to both private patients and patients whose care is paid for by the Department of Veterans Affairs ("VA") and the Centers for Medicare & Medicaid Services ("CMS"), an agency of the Department of Health and Human Services ("DHHS"). (Defs' Corr. Mem., pp. 2). Rotech delivers its services through approximately 3,500 employees operating out of 450 locations in 48 states, including its office in Central Point, Oregon. (Am. Compl., ¶ 3; Pl's Mem. Opp'n Defs' Mot. Summ. J., Dckt. # 53, pp. 3).

### A. The May 2008 Corporate Integrity Agreement

On April 6, 2004, a qui tam action was filed against Rotech in the United States District Court for the Eastern District of Texas, Texarkana Division, United States of America ex rel. Sheila Bell-Messier v. Ro-Tech Healthcare, Inc., et al., Civil Action No. 5:04-cv-0075. (Decl. Stephani L. Ayers ("Ayers Decl."), Ex. 1, Dckt. # 54-7, pp. 2, & Ex. 2, Dckt. # 54-8). The Complaint alleged Rotech committed multiple ongoing violations of the FCA between February 22, 1996, and April 30, 2003, by fraudulently billing the government for durable medical equipment ("DME") including respiratory devices; and further that Rotech fraudulently concealed these billing practices from the government in violation of a Corporate Integrity Agreement ("CIA") entered into as the result of a 2002 settlement with the government for other compliance issues. (Id., Ex. 1, Dckt. # 54-7, pp. 2, & Ex. 2, Dckt. # 54-8, pp. 6-7). In particular, the Complaint alleged Rotech failed to follow "[t]he proper procedures necessary to receive

compensation for DME from Medicare," including, in relevant part, the failure to obtain and retain delivery tickets signed by the patient evidencing delivery and receipt of the DME. (Id., Ex. 2, Dckt. # 54-8, pp. 4-5).

On May 19, 2008, Rotech, without admitting any wrongdoing, entered into a settlement agreement with the government regarding the April 2004 qui tam action and contemporaneously entered into another CIA with the Office of the Inspector General ("OIG") of the United States Department of Health and Human Services ("DHHS"). (Ayers Decl., Ex. 1, Dckt. # 54-7, pp. 2-3). The CIA requires that Rotech "promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs," (id., pp. 3), through compliance management and oversight, written standards, training and education, review procedures, a disclosure program, screening and removal of ineligible persons, and reporting, (id., pp. 4-18).

As part of compliance management and oversight, the CIA requires that Rotech "continue to develop, implement and distribute a written Code of Conduct" stating Rotech's commitment to non-retaliation and its requirement that all owners, officers, directors, and employees ("Covered Persons") comply with all federal health care program requirements and Rotech policies and procedures, and report all "suspected violations" to its Compliance department. (Id., pp. 3, 6-7). The CIA further requires that Rotech "continue to maintain and implement" written policies and procedures addressing, in relevant part, all applicable federal health care program requirements governing coverage and reimbursement of oxygen and the proper documentation necessary for the submission and reimbursement of claims, as well as the expectation that all Covered Persons comply with Rotech's Code of Conduct, policies, procedures, and the CIA itself. (Id., pp. 8).

As part of training and education, the CIA requires that Rotech describe its compliance program and provide all covered persons involved in billing, coding and claims submission, or the preparation or completion of documentation to support claims for reimbursement with annual training on "the federal health care program requirements governing coverage and reimbursement of oxygen, the proper completion of documentation necessary to support the reimbursement of claims; the personal obligation of each individual involved in the claims submission process to ensure that such claims are accurate; . . . [and] examples of proper and improper claims submission practices." (Id., pp. 4, 9-10). The CIA requires that Rotech retain all documents and records relating to reimbursement from Federal health care programs and compliance with the CIA for at least six years. (Id., pp. 25).

As part of review procedures, the CIA requires that Rotech retain an independent review organization ("IRO") to, among other things, conduct annual claims review of 50 paid claims, and to repay any overpayment identified as a part of that review. (Id., pp. 11-12). Overpayment is defined as "the amount of money Rotech has received in excess of the amount due and payable under any Federal health care program requirements." (Id., pp. 16). The definitions and procedures for the Claims Review process are documented in Appendix B of the CIA. (Id., pp. 38-43). Appendix B provides, at Section A, subsection 5(a), provides that "any Paid Claim for which Rotech cannot produce documentation sufficient to support the Paid Claim shall be considered an error and the total reimbursement received by Rotech for such Paid Claim shall be deemed an Overpayment." (Id., pp. 40).

As a part of reporting, the CIA requires Rotech to notify OIG in writing within 30 days of identifying any reportable event. (Id. at 18). "Reportable event" is defined to include both isolated and recurring instances of substantial overpayment as well as "a matter that a reasonable

person would consider a probable violation of criminal, civil or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized." (Id., pp. 17).

The CIA provides certain stipulated monetary penalties in the event that Rotech fails to comply with its obligations. (Id., pp. 26-27). The CIA further provides that a failure by Rotech to report a Reportable Event, take corrective action, and make the appropriate refunds, or repeated or flagrant violation of its obligations under the CIA, is a material breach of the CIA and "constitutes an independent basis for Rotech's exclusion from participation in the Federal health care programs." (Id., pp. 28-29). In the event of a material breach, the CIA further provides that Rotech shall have 30 days in which to demonstrate that it is either in compliance with its obligations, that the material breach has been cured, or, if the breach cannot be cured within 30 days, that Rotech has taken action to cure, is diligently pursuing the cure, and has provided a reasonable timetable for curing the breach. (Id., pp. 29).

### B. Rotech's Compliance Department

Rotech's Compliance Department is responsible for conducting annual regulatory and compliance training related to Rotech policies and procedures, as well as federal and state laws and regulations, for all employees. (Decl. Robin Menchen Supp. Defs' Mot. Summ. J. ("Menchen Decl."), Dckt. # 42, ¶ 5). Training is administered by area managers and LCMs through orientation programs and by the Compliance Department through individualized computerized training modules targeted to the individual employee's position. (Id.; Thelen Decl., Ex. 3, Deposition of Robin Lynn Menchen ("Menchen Dep."), Dckt. # 44-2, pp. 18-19). The Compliance Department monitors and verifies that employees complete the online training. (Thelen Decl., Ex. 4, Deposition of Jack McKenna ("McKenna Dep."), Dckt. # 44-2, pp. 37).

## C. Rotech's Code of Conduct

Rotech's Code of Conduct requires that all "owners, directors, officers, employees, contractors, subcontractors, and temporary employees shall comply with Rotech's Code of Conduct, all policies and procedures and Rotech's Corporate Integrity Agreement with the Office of the Inspector General," as well as Rotech's Employee Handbook and periodically distributed memoranda and policy statements. (Decl. Christine E. Thelen Supp. Mot. Summ. J. ("Thelen Decl."), Ex. 11, Dckt. # 44-2, pp. 84, 88-89).[2] Employees are required to certify in writing that they have received, read, and understand this policy. (Id., pp. 88). The Code of Conduct explicitly states that failure to comply with its provisions may result in serious consequences to the employee including dismissal, criminal charges, and civil penalties. (Id., pp. 88, 91). The Code of Conduct requires mandatory disclosure of known or suspected violations of "federal, state or local law or regulations or this Code of Conduct," and provides that "[f]ailure to report unlawful or unethical conduct is itself a violation of this Policy Statement and may lead to disciplinary action, up to and including termination of employment." (Id., pp. 90-91). The Code of Conduct emphasizes that retaliation against an employee who reports, in good faith, actual or potential violations is prohibited. (Id., pp. 88-89, 91).

## D. Rotech's Proof of Delivery Policy

Rotech ensures that the equipment and services it bills for are actually provided to the patient by documenting delivery according to its Proof of Delivery policy. (Thelen Decl., Ex. 13, Dckt. # 44-2, pp. 96-97). The Proof of Delivery policy requires that the patient or their designee must sign and date a delivery ticket for all deliveries made by Rotech employees. (Id.).

---

[2] Some exhibits have been docketed in batches rather than individually. For the purpose of clarity, these exhibits are identified by the declaration and exhibit number, and citations are to the docket numbers in the Electronic Case File ("ECF") with pin cites to the electronically-stamped pages at the top of the document, not the original pages of the exhibit.

No signature is required for equipment delivered via common carrier, freight carrier, or drop shipment from the manufacturer. (Id.; Menchen Dep., Dckt. # 44-2, pp. 16-17). The Proof of Delivery policy provides that "[n]o payer will be billed without proof of delivery/shipment" and requires that the original signed delivery ticket be forwarded to the Billing Center and a copy be retained in the patient's location file. (Thelen Decl., Ex. 13, Dckt. # 44-2, pp. 97). Rotech's Proof of Delivery policy does not directly correlate to the billing requirements of its customers. (Menchen Dep., Dckt. # 44-2, pp. 17). That is, although Rotech's Proof of Delivery policy requires a patient signature for all deliveries made by a Rotech employee, this does not mean that a patient signature is required for Rotech to bill the payer; instead, the payer's billing requirements are established by the terms of the contract between Rotech and the payer. (Id.).

### E. Rotech's contract with the United States Department of Veterans Affairs

Rotech's contract with the United States' Department of Veterans Affairs ("VA") requires that Rotech be nationally accredited by and meet the standards set by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"). (Menchen Decl., ¶¶ 9-10 & Ex. D, Dckt. # 42-2, pp. 47). Accordingly, Rotech is required to "educate, evaluate, and document employee education" on an ongoing basis to ensure that all its employees involved in the delivery and recovery of DME meet JCAHO standards. (Id., Ex. D, Dckt. # 42-2, pp. 42). Only employees who "have been properly trained and who have demonstrated competency may perform equipment deliveries, recoveries, and patient education on the equipment. (Id., pp. 43). Rotech employees are required to perform safety assessments and to report to the VA any hazards in the home that preclude the installation or require the removal of oxygen and related equipment in the patient's home. (Id., pp. 41). Rotech employees may not change or alter a VA patient's oxygen prescription or equipment requirements without a new prescription from the

patient's VA physician. (Id., pp. 44). Rotech is required to "provide staff with documented competency training to deliver prescribed supplies/cylinders/liquid oxygen (LOX)," (id., pp. 45); to store clean and contaminated equipment in clearly demarcated separate storage areas in both the warehouse and vehicles, (id., 46); and to use only vehicles that are licensed and conform with the relevant state, county, and city standards in the performance of the contract, (id., 48).

The VA contract requires Rotech to submit monthly billing reports, consisting of an invoice for each patient that includes the contract number, patient name, last four digits of the patient's social security number, the period of service, and an itemized list of equipment in place and supplies used. (Id., pp. 38, 56, 58). Rotech is required to maintain a folder for each patient containing a complete record of all services provided the patient, and to make these folders available to the VA during quarterly unscheduled monitoring visits. (Id., 44-45, 56). Patient folders must be maintained in compliance with the Privacy Act and Health Insurance Portability and Accountability Act ("HIPAA"). (Id., pp. 45).

The contract specifies that Rotech may not leave deliveries unattended at a patient's home. (Id., pp. 40). In the event a patient "chronically fails to meet appointments," Rotech is required to contact the VA with evidence of "valid and documented attempts to contact" the patient, at which time the VA will assume the responsibility for implementing a "corrective action plan" with the patient. (Id.).

## II. Neighorn

Rotech hired Neighorn as a Patient Service Technician ("PST") for its Central Point office on April 26, 2006. (Decl. Catherine Long Supp. Defs' Mot. Summ. J. ("Long Decl."), Dckt. # 41, ¶ 3). The duties of a PST include delivering and setting up oxygen tanks and equipment related to providing oxygen in patient homes, educating patients on the safe use of the

Page 8 – ORDER

equipment, maintaining delivered equipment, reporting equipment hazards and product incidents, and completing related paperwork. (Thelen Decl., Ex. 10, Dckt. # 44-2, pp. 81-83). In July of 2009, Neighorn signed a PST job description dated as "revised January 1, 2008," documenting these duties. (Id., Ex. 1, Deposition of John Neighorn ("Neighorn Dep."), Dckt. # 44-1, pp. 100-101).[3] At the relevant time, the Central Point office also employed PST Harold Stahl, PST Clyde Gore, Customer Service Representative ("CSR") Catherine Windsor, and Respiratory Therapist ("RT") Lacy Lydon, all of whom were supervised by the Location Manager ("LCM"). (Pl's Mem. Opp'n, pp. 3-4). In March of 2007, Susan Coghill was promoted to LCM for Rotech's Central Point office. (Decl. Amanda Mauney Supp. Defs' Mot. Summ. J. ("Mauney Decl."), Ex. A, Dckt. # 43-1, pp. 4).

### A. Neighorn received Rotech's Code of Conduct

Neighorn was given Rotech's employee handbook and the Code of Conduct in April of 2006 and, although he did not read these materials at that time, per his manager's instruction he signed a certificate acknowledging that failure to comply with Rotech's policies could result in disciplinary action up to and including dismissal. (Neighorn Dep., Dckt. # 44-1, pp. 2-4; Thelen Decl., Ex. 12, Dckt. # 44-2, pp. 95). Neighorn did eventually review Rotech's Code of Conduct. (Neighorn Dep., Dckt. # 44-1, pp. 4-5). Neighorn understood compliance with the Code of Conduct to be a condition of his employment. (Neighorn Dep., Dckt. # 44-1, pp. 5).

### B. Neighorn received compliance training

Rotech's records show that Neighorn was assigned General Compliance Training and Specialized Compliance Training modules in both 2008 and 2009 through Rotech's online

---

[3] The parties have separately submitted multiple deposition excerpts and supplemental deposition excerpts for multiple deposition witnesses. For the purpose of clarity, these exhibits are identified by the name of the deposition witness and citations are to the docket numbers in the ECF with pin cites to the electronically-stamped pages at the top of the document, not the original page of the exhibit or deposition.

training system. (Menchen Decl., ¶ 6 & Ex. A, Dckt. # 42-1, pp. 1). Neighorn's progress is shown as "completed" in 2008 and "in progress" in 2009 for the Specialized Compliance Training module, and "in progress" in 2008 and "completed" in 2009 for the General Compliance Training. (Id.). The Specialized Compliance Training for both 2008 and 2009 addressed, among other things, the avenues available for contacting the Compliance Department, the FCA's qui tam provision and the key elements of an FCA claim, and the importance of completing delivery tickets, including obtaining the patient's signature and date. (Menchen Decl., ¶¶ 7-8 & Exs. B & C, Dckt. # 42-1, pp. 3-6, 9-10, 14-15, 21-23).

### C. Rotech's Proof of Delivery policy & the "porching" practice

Neighorn understood compliance with the Proof of Delivery policy to be a requirement of his employment. (Neighorn Dep., Dckt. # 44-1, pp. 6). However, Neighorn asserts that Rotech managers Dave Case and Dave Schatler advised him that the Proof of Delivery policy did not apply in rural areas such as those serviced by Rotech's Central Point office. (Pl's Mem. Opp'n Mot. Summ. J., Dckt. # 53, pp. 9; Decl. Clyde Gore ("Gore Decl."), Dckt. # 62, pp. 2; Ayers Decl., Ex. C, Neighorn Dep., Dckt. # 54-3, pp. 5). Rather, if a PST servicing a patient in a rural area was unable to make contact with the patient, the PST was to document this and either leave the equipment where instructed by the patient or leave a note for the patient. (Neighorn Dep., Dckt. # 54-3, pp. 5). Neither Mr. Case nor Mr. Shatner instructed Neighorn that he could fabricate a patient's signature, and no member of Rotech's corporate management told Neighorn he was exempt from the Proof of Delivery policy. (Neighorn Dep., Dckt. # 44-1, pp.7). To the best of his knowledge, the oxygen and equipment Neighorn delivered via this "porching" practice was always actually received by the patient for whom it was intended. (Id., pp. 29).

PST Stahl similarly understood that Rotech's Proof of Delivery policy was not strictly enforced in rural areas. (Ayers Decl., Ex. D, Deposition of Harold William Stahl ("Stahl Decl."), Dckt. # 54-4, pp. 6). Stahl worked for Rotech as a PST from 2002 until 2010. (Id., pp. 3). During that time, Stahl's experience was that Rotech's corporate delivery policy was not consistent with either the reality of the circumstances faced by its delivery drivers or the practice of its delivery drivers to leave the equipment at the patient's home and notate "left at door" on the delivery ticket. (Id.). One particular patient ("patient R.N.") went so far as to specifically authorize Stahl to sign on his behalf. (Id., pp. 5). Like Neighorn, the oxygen and equipment Stahl delivered via this "porching" practice was, to his knowledge, always actually received by the patient for whom it was intended. (Id., pp. 7). Coghill held daily morning meetings during the last two years of Stahl's employment with Rotech. (Id., pp. 4). Stahl frequently brought the subject of "porching" up during these meetings. (Id.).

CSR Windsor was also present during the daily morning meetings. (Ayers Decl., Ex. F, Deposition of Catherine Windsor ("Windsor Dep."), Dckt. # 54-6, pp. 16-17, 25-27). She overheard the PSTs regularly discussing the "porching" practice, but did not observe Coghill ever reprimanding the PSTs for this practice or informing them that this practice was a violation of Rotech policy. (Id.). Windsor knew the "porching" practice was a violation of Rotech policy. (Id., pp. 17). However, Coghill told Windsor not disclose this practice to anyone and Windsor, fearing that Coghill would fire her if she did not obey, complied with that instruction. (Id., pp. 17-18). Windsor recognized "porching" as an obvious violation of Rotech policy and believed that Coghill ordered her not to disclose it in order to avoid the office to getting in trouble with Rotech's corporate office. (Id., pp. 19).

//

## D. Delivery tickets and billing

Neighorn knew that his delivery tickets were reviewed first by Windsor and then by Coghill before being submitted to the billing department, but was not otherwise familiar with the billing process. (Neighorn Dep., Dckt. # 44-1, pp. 30-31). He was aware that some delivery tickets submitted to billing were being returned and, in some instances but not all, was instructed to obtain patient signatures for delivery tickets which had been submitted with a blank patient signature block. (Id., pp. 14-15). Coghill told Neighorn that if he "scribbled" where he left the equipment in the patient signature block of the delivery ticket instead of printing that notation, the delivery ticket was less likely to be rejected by billing. (Id.). Similarly, Coghill instructed PST Stahl to do "whatever it takes" to make a delivery if a patient was not home. (Stahl Dep., Dckt. # 54-4, pp. 5).

In Neighorn's experience, typically either the patient or their spouse would leave a note explaining why they were not home and requesting that he leave the equipment. (Supplemental Decl. Christine E. Thelen Supp. Defs' Mot. Summ. J. ("Suppl. Thelen Decl."), Ex. 36, Neighorn Dep., Dckt. # 65-2, pp. 2). Per Coghill's instructions, Neighorn would leave the oxygen and related equipment at the patient's home and would "scribble" a note in the patient signature block. (Neighorn Dep., Dckt. # 44-1, pp. 10-11, 13-14). He included the name of the patient or the patient's spouse and noted any specific instructions from the patient or spouse about where the equipment was to be left, such as "left on porch" or something similar. (Neighorn Dep., Dckt. # 65-2, pp. 2; Neighorn Dep., Dckt. # 44-1, pp. 13-14, 19, 25-26). Until the time of his termination, neither Coghill nor any other Rotech management employee informed Neighorn that this practice constituted a violation of Rotech policy. (Neighorn Dep., Dckt. # 54-3, pp. 6). Likewise, although Stahl was aware of Rotech's policy requiring patient signatures, he did not

Page 12 – ORDER

really understand the "porching" practice to be a violation of Rotech policy. (Stahl Dep., Dckt. # 54-4, pp. 7).

Neighorn did not believe that scribbling the "left on porch" notation constituted an attempt to forge the patient's signature, nor did he make the notation for the purpose of creating the appearance that the patient had actually signed the delivery ticket. (Neighorn Dep., Dckt. # 44-1, pp. 10, 26; Thelen Decl., Ex. 22, Dckt. # 44-4, pp. 3-4). Neither Neighorn nor Stahl understood Coghill's instructions to be a general order to forge patient signatures. (Stahl Dep., Dckt. # 54-4, pp. 5-6; Neighorn Dep., Dckt. # 44-1, pp. 14). Once, sometime between November 2009 and March 2010, Coghill approached Neighorn and asked him for his opinion on the appearance of a signature. (Neighorn Dep., Dckt. # 44-1, pp. 55-57). Neighorn observed that the signature was on a piece of "onion" or tracing paper and that Coghill was carrying a patient chart, and therefore deduced that she had forged the patient's signature; however, he did not witness Coghill actually tracing a signature. (Id., pp. 56-57). He was so shocked by the incident that he did not note the signed name or the name of the patient file Coghill was carrying. (Id., pp. 57). On February 12, 2012, the one occasion when Coghill specifically instructed Stahl to forge a patient's signature ("patient R.S.") on a delivery ticket, he declined to do so. (Stahl Dep., Dckt. # 54-4, pp. 5-6; Mauney Decl., Ex. A, Dckt. # 43-1, pp. 7).

## III. Neighorn's Internal Compliance Complaint & Rotech's Investigation

On March 2, 2010, Neighorn submitted a written complaint to Rotech Area Manager Nancy Fannin, Human Resources ("HR") Representative Melissa Daggs, and Rotech's Vice President of HR, Jack McKenna. (Thelen Decl., Ex. 15, Dckt. # 44-2, pp. 102-117; & Ex. 29,

Dckt. # 44-5, pp. 4-11).[4] In relevant part, Neighorn reported that (1) when PST Gore was out on medical leave, Coghill advised him, Stahl, and Windsor not to write any progress notes or otherwise document the files of VA patients because the VA had concerns that Rotech lacked sufficient coverage to service its patients and might use Gore's absence as a reason for terminating its contract; (2) on February 24, 2010, Coghill instructed him to leave multiple oxygen tanks in a patient's driveway and leave without having the patient sign the delivery ticket and threatened to fire him when he refused; (3) Coghill subsequently attempted unsuccessfully to issue him a disciplinary letter in retaliation for his refusal to comply with her request and then refused to provide him with a copy of his personnel file when he requested it; (4) Coghill regularly falsified the location's inventory records; (5) Coghill had forged patient signatures on medical records and company forms; (6) Coghill regularly falsified her reports of "ride alongs" with the location's PSTs; (7) Coghill regularly required the Central Point employees to sign acknowledgments of Rotech policies without providing them with a copy of those policies to keep for their records; and (8) when Neighorn refused to provide patients with services or products they requested due to JCAHO, safety, prescription, or VA policy violations and the patients complained about his service, Coghill simply assigned other Central Point employees to provide the services and products requested by the patient and ignored the relevant policy and standards violations. (Thelen Decl., Ex. 15, Dckt. # 44-2, pp. 106-112, 114, 116).

Neighorn's complaint was forwarded to Catherine Long, Rotech's Western Division HR Manager. On March 3, 2010, Long forwarded Neighorn's complaint to Wayne Bradberry, Rotech's Director of Compliance. (Long Decl., ¶ 4 & Ex. B, Dckt. # 41, pp. 5). That same day, Bradberry created a confidential disclosure log, case 6733, describing Neighorn's complaint as

---

[4] Neighorn had previously emailed Daggs on April 23, 2009, concerning HR issues, primarily his frustrations with Coghill as a manager and Fannin's unresponsiveness to his complaints. (Pl's Mem. Opp'n Summ. J., Dckt. # 53, pp. 12; Thelen Decl., Ex. 14, Dckt. # 44-2, pp. 98-101).

"Altering/Falsifying Patient Records. LCM is forging patient signatures on documents and company paperwork. LCM instructs PST to deliver cylinders without obtain [sic] patient signatures." (Ayers Decl., Ex. 3, Attachment 1 ("Pl's Ex. 3-1"), Dckt. #56-1).[5] On March 4 and 5, 2010, Long conducted a telephone interview of Neighorn regarding his complaint, during which Neighorn repeated, in relevant part, his claims that (1) Coghill falsified inventory reports by under-reporting the stock held at the Central Point office; (2) he had seen Coghill sign a delivery ticket and heard from Windsor that she had observed the same, but could not provide patient names; and (3) Coghill allowed VA patients to receive oxygen and equipment in violation of JCAHO, safety, prescription, or VA policy violations, and assigned other Rotech employees to service the patients when Neighorn refused to comply with the patients' requests and the patients complained about Neighorn's service. (Long Decl., ¶ 3 & Ex. A, Dckt. # 41, pp. 3-4).

In keeping with Rotech's Compliance Investigation Process, (Thelen Decl., Ex. 16, Dckt. # 44-2, pp. 188-122), Rotech Compliance Specialists Tamara "Teddi" Thompson and Amanda Mooney ("the Compliance investigators") were assigned to investigate Neighorn's complaint. (Thelen Decl., Ex. 6, Deposition of Tamara Tait ("Tait Dep."), Dckt. # 44-2, pp. 52; Mauney Decl., Dckt. # 43, ¶ 2). Thompson and Mooney visited Rotech's Central Point office on March 9 through March 11, 2010, to conduct employee interviews. On April 19, 2010, Thompson submitted an initial memorandum to Mauney summarizing the results of the investigation thus far. (Thelen Decl., Ex. 17, Dckt. # 44-2, pp. 123-131). Bradberry was copied on the initial memorandum. (Id.). The Compliance investigators subsequently conducted follow up

---

[5] At oral argument it became evident that plaintiff intended the one-page document docketed as Docket # 56-1 to be plaintiff's Exhibit 5. However, because the exhibit was submitted with six additional pages clearly marked as "Exhibit 3" and was not itself clearly marked as a separate exhibit, it was attached to plaintiff's Exhibit 3. For purposes of clarity, this document will be identified as plaintiff's Exhibit 3-1, and citations will be to the docket number in the ECF.

interviews on March 24, 2010, and April 15, 2010. (Mauney Decl., Dckt. # 43, ¶ 2 & Exs. A-B, Dckt. # 43-1, pp. 1-21).

### A. Investigators interview Neighorn

Neighorn was interviewed by the investigators only once, on March 9, 2010. During that interview, he reported the incident where he suspected Coghill had forged a patient's signature to the investigators. (Neighorn Dep., Dckt. # 44-1, pp. 57). He reported that Coghill had forged patient signatures on medical records and other documents and provided a patient name to the investigators as an example; however, a review of that patient's chart did not validate any forgery activity. (Thelen Decl., Ex. 17, Dckt. # 44-2, pp. 124; Mauney Decl., Ex. A, Dckt. # 43-1, pp. 3). He reported the "porching" practice and scribbling the "left on porch" notation on delivery tickets. (Mauney Decl., Ex. A, Dckt. # 43-1, pp. 3). Neighorn acknowledged that the "porching" activity was against company policy and grounds for his termination. (Id.). He specified that he would only "porch" oxygen and supplies if the patient's home was in a rural area, and described the February 24, 2010, incident when Coghill instructed him to leave oxygen tanks in a patient's driveway in a downtown area, his refusal, and her threatening demeanor. (Id.). He denied being instructed to forge patient signatures by Coghill. (Id.).

### B. Investigators interview Stahl

The Compliance investigators interviewed Stahl first on March 10, 2010, and a second time on March 24, 2010, at his request. (Thelen Decl., Ex. 17, Dckt. # 44-2, pp. 124-125; Mauney Decl., Ex. A, Dckt. # 43-1, pp. 5). In the initial interview, Stahl at first denied ever signing a delivery ticket with a patient's signature or engaging in the "porching" practice, and asserted that if a patient was not home he would leave a door tag with Rotech's number requesting the patient to call. (Stahl Dep., Dckt. # 54-4, pp. 8; Thelen Decl., Ex. 17, Dckt. # 44-

2, pp. 124-125; Mauney Decl., Ex. A, Dckt. # 43-1, pp. 5-6). However, then the investigators presented him with examples of delivery tickets for patient R.N., Stahl admitted he had signed multiple delivery tickets on behalf of this patient and claimed similar incidents had occurred with other patients, but denied being instructed to sign patient names by Coghill. (Thelen Decl., Ex. 17, Dckt. # 44-2, pp. 125; Mauney Decl., Ex. A, Dckt. # 43-1, pp. 6).

In the March 24, 2010, interview, Stahl reported he had withheld information from the Compliance investigators out of fear of retribution by Coghill. (Thelen Decl., Ex. 17, Dckt. # 44-2, pp. 125; Mauney Decl., Ex. A, Dckt. # 43-1, pp. 7). He stated that Coghill called him the day the Compliance investigators arrived at the Central Point office and instructed him not to disclose or admit that he signed delivery tickets on behalf of patients. (Id.). He further explained that the PSTs regularly discussed the "porching" practice during the daily office calls and that Coghill never commented on those conversations. (Id.). He described the February 12, 2010, incident when Coghill directly instructed him to sign the delivery ticket for patient R.S., explaining that he refused to do so because he had never seen that patient, and instead either left the signature block blank or wrote "left at door per [Coghill]" and then sent the delivery ticket to the Central Point office as per usual protocol. (Id.). The Compliance investigators pulled the patient file, retrieved the delivery ticket in question, and determined that the patient signature was questionable. (Id.).

**C. Investigators interview Windsor**

The Compliance investigators interviewed Windsor twice, first in an initial interview on March 9, 2010, and a second time on April 15, 2010. (Mauney Decl., Ex. A, Dckt. # 43-1, pp. 3-4, 8-9). At the initial interview, Windsor denied knowledge of any suspicious activities at the office, claimed the office was compliant with all policies and procedures, and described Coghill

as "a wonderful manager" who was "doing an exceptional job" running the Central Point office. (Id., pp. 4). She described Neighorn as difficult to work with, her suspicion that Neighorn was trying to cause "problems" for Coghill, and reported that Neighorn's "most common mistake was failure to complete 3rd party signor information." (Id., pp. 3). She described the daily morning meetings without mentioning the "porching" practice. (Id.).

During the second interview on April 15, Windsor reported the PSTs "regularly" discussed the "porching" practice and that Stahl "often" admitted that he left tanks when patients were not at home. (Id., pp. 8). However, she never heard any instruction given to the PSTs regarding this practice nor did any PST ever admit to signing a patient's name. (Id.). Windsor reported that delivery tickets were mailed to the Central Point office where she would sort and batch them to send to billing, but that sometimes Coghill would intercept and take possession of incoming mail. (Id.). She stated she would confirm that a signature was indicated in the appropriate section, but denied reading or otherwise attempting to decipher the signatures. (Id.). She was presented with and denied signing the delivery ticket for patient R.S., but was unable to either identify the signature or explain what had happened. (Id., pp. 8-9).

### D. Investigators interview Coghill

The Compliance investigators interviewed Coghill four times: when they first arrived in Central Point on March 9, 2010; a second time on March 11, 2010, after interviewing Windsor and Stahl; a third time on March 24, 2010, after Stahl gave his amended testimony; and a fourth and final time on April 15, 2010, to specifically resolve the issue of the February 12, 2010, delivery ticket for patient R.S. (Mauney Decl., Ex. A, Dckt. # 43-1, pp. 4-9). During the initial interview, the Compliance investigators noted multiple signs of that Coghill was being deceitful, and therefore noted her demeanor throughout the remainder of the investigation. (Id., pp. 9).

Coghill initially reported she was unaware of any "porching" activity and stated the common practice was for PSTs to leave a door tag for the patient or have a neighbor sign on the patient's behalf. (Thelen Decl., Ex. 17, Dckt. # 44-2, pp. 127; Mauney Decl., Ex. A, Dckt. # 43-1, pp. 4, 6). She described certain occasions on which she had instructed PSTs to leave equipment at a patient's home, in which case the PST was required to obtain the patient's signature at a subsequent delivery. (Thelen Decl., Ex. 17, Dckt. # 44-2, pp. 127; Mauney Decl., Ex. A, Dckt. # 43-1, pp. 4). She stated Windsor brought all delivery tickets with errors to her attention; those tickets would then be returned to the PST to obtain the necessary correction. (Mauney Decl., Ex. A, Dckt. # 43-1, pp. 4). Coghill explained that on February 24, 2010, Neighorn refused to make a delivery to a patient, therefore she instructed him to leave the patient's oxygen cylinders on the porch along with the delivery ticket so the patient could sign it and send it back, stating she felt this would be acceptable because the patient would be present at the time of delivery. (Id., pp. 5).

During the March 11 interview, Coghill denied hearing any discussion by the PSTs at the daily morning meetings regarding "porching" activity and denied ever telling any PST to complete a delivery ticket on a patient's behalf or by using the "left on porch" verbiage. (Id., pp. 6). She stated that if a PST was known to have completed a delivery ticket for a patient, disciplinary action would be enforced. (Id.). She further explained that when she was promoted to LCM for the Central Point office, she assumed the PSTs had received adequate training on how to complete delivery tickets, therefore, training never became an issue. (Id.; Thelen Decl., Ex. 17, Dckt. # 44-2, pp. 128).

However, during the March 24 interview, Coghill responded to questions from the Compliance investigators on whether she had coached Stahl on how to respond to questions by

stating that she was nervous about the investigation and used the conversation with Stahl as a training opportunity to discuss the correct process for completing delivery tickets. (Thelen Decl., Ex. 17, Dckt. # 44-2, pp. 128; Mauney Decl., Ex. A, Dckt. # 43-1, pp. 7). Coghill stated she wanted to make sure Stahl knew he was not supposed to sign for patients and that she knew in the back of her mind that it was going on. (Mauney Decl., Ex. A, Dckt. # 43-1, pp. 7). She further stated she had been trying to instruct the PSTs about the proper process for completing delivery tickets every couple of weeks and, although she again denied having specific knowledge of forged signatures, admitted she was concerned the Compliance investigators would find something. (Thelen Decl., Ex. 17, Dckt. # 44-2, pp. 129). When reminded by the Compliance investigators that she initially stated she did not have any such concerns, she could not explain why she had the conversation except to say it just "popped into her head." (Id.).

Coghill then proceeded to describe the February 12 incident involving patient R.S. and Stahl, stating that she instructed Stahl to leave the oxygen tanks at the patient's home although he was not there but did not instruct him to sign the delivery ticket. (Id.; Mauney Decl., Ex. A, Dckt. # 43-1, pp. 7). When the Compliance investigators presented her with the delivery ticket, Coghill noted that whoever had signed the patient's name had used blue ink to match the employee signature. (Thelen Decl., Ex. 17, Dckt. # 44-2, pp. 129; Mauney Decl., Ex. A, Dckt. # 43-1, pp. 8). When informed that Stahl had not signed the delivery ticket, Coghill implicated Windsor and denied any involvement with the signature. (Id.). The Compliance investigators suspected her testimony was not truthful based upon non-verbal cues and discrepancies in her statements. (Thelen Decl., Ex. 17, Dckt. # 44-2, pp. 129).

At the fourth and final interview on April 15, the Compliance investigators again presented Coghill with the February 12 delivery ticket for patient R.S. (Thelen Decl., Ex. 17,

Dckt. # 44-2, pp. 130; Mauney Decl., Ex. A, Dckt. # 43-1, pp. 9). Based on the timeline of events, Coghill agreed Stahl had not signed the ticket, adding that when he signed a patient's name he would scribble it or write "left on porch." (Id.). She agreed that all evidence pointed to her but repeatedly stated the evidence was circumstantial. (Mauney Decl., Ex. A, Dckt. # 43-1, pp. 9). When the Compliance investigators compared the signature to samples of her own writing, Coghill agreed there were similarities but stated the circumstances surrounding how the ticket had been signed were purely speculation. (Id.; Thelen Decl., Ex. 17, Dckt. # 44-2, pp. 130). The Compliance investigators noted she appeared unconcerned and uninterested in finding a resolution. (Mauney Decl., Ex. A, Dckt. # 43-1, pp. 9).

### E. The Compliance investigators perform a comprehensive file review

As part of their investigation process, the Compliance investigators performed a comprehensive file review of all patients serviced by Neighorn and Stahl between December 1, 2008, and March 12, 2010. (Mauney Decl., Exs. A & B, Dckt. # 43-1, pp. 10, 20). Of the 406 patient files reviewed, 507 documents in 109 patient files were identified as having questionable patient signatures. (Id.). In a preliminary report dated May 3, 2010, the Compliance investigators noted that "[a]t the discretion of the VA all identified delivery tickets will be taken out to the patient, confirmed and proper signature obtained, or refunds issued." (Mauney Decl., Ex. B., Dckt. # 43-1, pp. 21). On February 24, 2011, the Compliance investigators issued a final report noting that "[f]ollowing a signature validation process by [Rotech] employees," signature validations were obtained for 49 of these patients, but were unobtainable for the remaining 60 patients for various reasons. (Mauney Decl., Ex. A, Dckt. # 43-1, pp. 10). Payment received for all dates of service for these patients was deemed an overpayment and a refund in the amount of

$7,833.65 was issued to the VA. (Id.). Rotech refunded these monies at its own initiative, not at the request of the VA. (Menchen Decl., Dckt. # 51, ¶ 4).

### F. Neighorn sends HR additional information

On March 17, 2010, Neighorn sent a second email directly to Long, who in turn forwarded the email to Daggs. (Thelen Decl., Ex. 23, Dckt. # 44-4, pp. 6-14). Neighorn attached notes he had been keeping of events in the office between March 8 and March 17, 2010, expressing (1) his concern, based on their behavior, that his complaint had been disclosed to Coghill and Windsor despite reassurances from HR that it would be confidential; (2) his perception that Windsor and Coghill were retaliating against him by not providing him with accurate or timely messages or paperwork relating to patients, resulting a dangerous delay in the initial setup of one VA patient ("patient J.H."); and (3) his observation that the hazards in the Central Point office, such as the lack of smoke detectors, fire extinguishers, and accurate inventory records, were unchanged. (Id.). The record does not reflect whether this information was provided to the Compliance investigators.

### G. Neighorn's continued observation of perceived violations

Neighorn continued to keep notes regarding his observations in the Central Point office through April 6, 2010. (Thelen Decl., Ex. 29, Dckt. # 44-5, pp. 1-62). On March 30, 2010, Neighorn visited a private (non-VA) patient ("patient R.K.") and recorded that she was out of E tanks, her empty tanks were dated 2008, and her concentrator's internal filters were dated 2007. (Id., pp. 20). Neighorn perceived the failure to service her concentrator to be a violation of both Rotech policy and JCAHO standards. (Id.).

On March 31, Coghill instructed Neighorn to unload 36 tanks of oxygen from his delivery truck and load them in the trunk of RT Lydon's personal vehicle. (Id., pp. 21).

Perceiving this to be a violation of JCAHO standards, Rotech policy, and Oregon law, Neighorn unloaded the tanks from his truck but refused to load them in Lydon's vehicle. (Id., pp. 21-11). He observed a woman who was not known to him assisting Lydon, going in and out of the Central Point equipment locker, and departing in the vehicle with Lydon. (Id.).

On April 1, Neighorn observed the same woman assisting Lydon with unloading her vehicle, placing equipment in the Central Point equipment locker, and mixing dirty and clean equipment in the process. (Id., pp. 23). Later that day he spoke to a patient who requested a delivery from either Lydon or the "trainee" who had assisted Lydon in the past. (Id.). Finding this reference odd, Neighorn asked Coghill who the woman was; Coghill told him the woman was Lydon's mother. (Id.). Neighorn recorded his shock that a non-Rotech employee who to his knowledge had received not undergone any screening, received any training, and was not JCAHO certified or trained was performing work for Rotech, being introduced to patients as a Rotech employee, and allowed access to Rotech's equipment and patient records, all of which he perceived as a violation of Rotech policy, JCAHO standards, and federal law. (Id., pp. 23-24).

On April 2, 2010, Neighorn noticed several documents posted in the Central Point office that had not previously been displayed, including a memorandum on safety and JCAHO surveys, a bulletin on the Rotech Compliance Hotline, and a memorandum dated March 22, 2010, from Rotech's Chief Operating Officer ("COO"), Chief Compliance Officer ("CCO"), and Director of Compliance referencing the termination of several employees dues to the exercise of poor judgment. (Id., pp. 24; Thelen Decl., Ex. 21, Dckt. # 44-4, pp. 2). Later that day, Neighorn spoke to Long and inquired about the status of the compliance investigation and whether he should report newly discovered JCAHO violations to HR or to Compliance, and provided examples. (Id., pp. 25). He recorded his frustration with Long's refusal to provide guidance and

confusion that Long represented she could not provide guidance with compliance issues when he felt she had done so in the past. (Id.). Neighorn then requested an updated handbook from Coghill; she refused his request on grounds that additional copies needed to be made first. (Id.). Noting that the bulletins he had observed earlier in the day were no longer displayed, Neighorn recorded his perception that Rotech's response to his complaint seemed retaliatory and directed towards finding errors with his work, and his frustration that there was no person within Rotech to whom he could report and discuss the violations he observed. (Id., pp. 26).

## IV. Neighorn's JCAHO Complaint & the JCAHO's Investigation

On April 3, 2010, Neighorn filed a complaint with the JCAHO. (Id.; Thelen Decl., ¶ 33 & Ex. 33, Dckt. # 44-5, pp. 72-74). In his complaint, Neighorn reported that (1) patient files were stored in unlocked file cabinets and boxes in unsecured areas of the warehouse; (2) the warehouse lacked sufficient smoke detectors and fire extinguishers; (3) oxygen storage vaults were left unlocked; (4) logs for compressed oxygen tanks were not accurately maintained; (5) his observation of non-employees in the oxygen storage vaults, assisting employees with the delivery of equipment, and his belief that this person lacked JCAHO training and certification; (6) the use of a personal vehicle by an employee to transport and deliver oxygen; (7) the mixing of clean and dirty equipment in the warehouse; (8) that patients found to be in gross violation of JCAHO safety standards were allowed to continue to receive oxygen and related equipment; (9) CPAP and BIPAP fittings and setups being done by the location manager who was not trained or certified to do so; (10) location PSTs being directed to leave compressed oxygen tanks unattended at patient homes and instructed that signing "left on porch" in the patient signature block was acceptable in rural or outlying areas; (11) alteration of certificates of medical necessity ("CMN") and forgery of patient signatures by the location manager; (12) the failure to properly

service a patient's compressor; (13) the policy of the location manager to require employees to certify receipt and reading of company and JCAHO policy changes without allowing employees to read the policy or retain a copy; and (14) his report of these violations to the company and suspicion that the company was covering up or ignoring these issues. (Id.).

The JCAHO conducted an investigation at Rotech's Central Point office on May 14, 2010. (See Thelen Decl., ¶ 25 & Ex. 24, Dckt. # 44-4, pp. 15-16). The JCAHO auditor uncovered multiple deficiencies during that investigation, including failure by Coghill to properly train staff on required forms, failure by Coghill to conduct PST ride-alongs, Coghill's practice of allowing non-management staff to train employees, improperly secured and unsecured oxygen tanks, improperly maintained fire extinguishers, failure to designate separate clean and dirty equipment areas, improperly serviced and calibrated equipment, inadequately documented CPAP charts, and inaccurate facility inspection sheets. (Id., pp. 16). These audit results created the risk that Rotech as an organization could lose its JCAHO accreditation. (Id.). Area Manager Nancy Fannin reviewed these investigation results with Coghill at an office visit on May 19, 2010. (Suppl. Thelen Decl., ¶ 6 & Ex. 39, Dckt. # 65-5).

## V. Rotech Takes Disciplinary Action

On March 16, 2010, after the Compliance investigators' initial round of interviews, but before the investigation was completed, Wayne Bradberry, Rotech's Director of Compliance, issued an email with recommendations for disciplinary action. (Thelen Decl., Ex. 18, Dckt. # 44-2, pp. 132). In this email, Bradberry reported that the original allegation against Coghill, that "she had been forging patient signatures on documents and company paperwork and was instructing PSTs to deliver cylinders without obtaining patient signatures," had not been substantiated by the investigation. (Id.).

## A. Neighorn

In his March 16 email, Bradberry recommended Neighorn be terminated for violating company policy "[d]ue to his admission to signing patients' names." (Thelen Decl., Ex. 18, Dckt. # 44-2, pp. 132). Rotech asserts it made the decision to terminate Neighorn's employment at some time prior to March 18, 2010. (Defs' Corr. Mem., pp. 9). However, Rotech did not terminate Neighorn's employment until April 8, 2010. (Id.; Thelen Decl., Ex. 22, Dckt. # 44-4, pp. 3-5). The employee performance counseling report documenting Neighorn's termination records the reason for termination as his admission to "scribbling patients' names on delivery tickets" despite his knowledge that this activity violated Rotech's Proof of Delivery policy. (Id.).

When presented with the employee performance counseling report advising him of the fact of his termination and the reason for it, Neighorn protested on grounds that he never stated he signed patients' names. (Id., pp. 3-4; Neighorn Dep., Dckt. # 44-1, pp. 9-11). The Compliance investigators' initial memorandum, preliminary report, and final report all reported that Neighorn stated the "left on porch" notation could be scribbled such that it was indistinguishable from a patient signature. (Thelen Decl., Ex. 17, Dckt. # 44-2, pp. 124; Mauney Decl., Exs. A & B, Dckt. # 43-1, pp. 3, 13). Neighorn denies making this statement and further denies that he ever forged or attempted to forge a patient's signature. (Neighorn Dep., Dckt. # 44-1, pp. 9-10; Thelen Decl., Ex. 22, Dckt. # 44-4, pp. 3-4). Instead, he argues he scribbled the "left on porch" notation instead of printing per Coghill's instruction, to make it less likely that the delivery ticket would be rejected by billing. (Neighorn Dep., Dckt. # 44-1, pp. 14).

Rotech's response, if any, to Neighorn's protest is not part of the record. Indeed, both the Compliance investigators' May 2010 preliminary report and February 2011 final report, both issued after Neighorn's termination had occurred, repeat the recommendation that Neighorn be

terminated "[b]ased on [his] admission to signing patients' names" without mentioning that
Neighorn disputed that he had done so. (Mauney Decl., Exs. A & B, Dckt. # 43-1, pp. 10, 20).

## B. Stahl

In his March 16 email, Bradberry recommended Stahl be terminated for violating
company policy "[d]ue to his admission to signing patients' names." (Thelen Decl., Ex. 18,
Dckt. # 44-2, pp. 132). Rotech asserts that it decided to terminate Stahl's employment at some
time prior to March 18, 2010. (Defs' Corr. Mem., pp. 9). The record does not reflect the date on
which Rotech actually terminated Stahl's employment. Both the Compliance investigators' May
2010 preliminary report and February 2011 final report repeat the recommendation that Stahl be
terminated "[b]ased on [his] admission to signing patients' names" in. (Mauney Decl., Ex. A &
B, Dckt. # 43-1, pp. 10, 20).

## C. Windsor

Although Windsor was aware of the "porching" practice, understood it to be an
"obvious" violation of Rotech policy, and observed that Coghill took no steps to correct it,
neither Bradberry nor the Compliance investigators recommended that any disciplinary action be
taken against her. Windsor did not receive any counseling or disciplinary action as the result of
the internal Compliance investigation. (Windsor Dep., Dckt. # 54-6, pp. 31).

## D. Coghill

Rotech terminated Coghill's employment in May of 2010. (Thelen Decl., Ex. 24, Dckt. #
44-4, pp. 15-19). In his March 16 email, Bradberry recommended Coghill receive documented
counseling "[d]ue to her admission of advising staff to leave oxygen, a regulated hazardous
material, unsecured at patient's [sic] home." (Thelen Decl., Ex. 18, Dckt. # 44-2, pp. 132). In
both their May 2010 preliminary report and February 2011 final report, the Compliance

investigators recommended Coghill be terminated based on her knowledge that Neighorn and Stahl were "signing patients' names on delivery tickets" and her failure to either stop the practice or report it as required by Rotech's Code of Conduct. (Mauney Decl., Ex. A & B, Dckt. # 43-1, pp. 10, 20).

The employee performance counseling report documenting Coghill's termination mentioned the internal Rotech compliance investigation, but focused on the May 14, 2010, JCAHO investigation. (Thelen Decl., Ex. 24, Dckt. # 44-4, pp. 16; *see also* Suppl. Thelen Decl., ¶ 7 & Ex. 40, Deposition of Tamara Tait ("Tait Dep."), Dckt. # 65-6). The report reviewed the errors discovered by the JCAHO auditor and noted that although Coghill had been properly trained for the position of LCM and had held that position for nearly three years, she failed to correct the JCAHO auditor's perception that she was a new employee whom Rotech had failed to sufficiently train. (Thelen Decl., Ex. 24, Dckt. # 44-4, pp. 16). Coghill's failure to correct this misperception and her failure to effectively manage the Central Point office put Rotech's entire West 2 region at risk of losing its JCAHO accreditation. (Id.; Tait Dep., Dckt. # 65-6, pp. 12). Finally, although Coghill had "excuses for every situation" when her Area Manager reviewed the audit results with her on May 19, 2010, those excuses were deemed "unreasonable and inconsistent" with the JCAHO auditor's report. (Thelen Decl., Ex. 24, Dckt. # 44-4, pp. 16).

## STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material of fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a) (2010); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986);

Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. Playboy Enters., Inc. v. Welles, 279 F.3d 796, 800 (9th Cir. 2002).  An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (*quoting* Anderson, 477 U.S. at 248).

When a properly supported motion for summary judgment is made, the burden then shifts, and the opposing party must set forth specific facts showing that there is a genuine issue for trial.  Anderson, 477 U.S. at 250; Auvil v. CBS "60 Minutes," 67 F.3d 816, 819 (9th Cir. 1995).  Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial.  Devereaux, 263 F.3d at 1076.  Put another way, summary judgment should be granted when the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor.  Anderson, 477 U.S. at 252.  In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party.  Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995).  When viewing the evidence at this stage, all justifiable inferences are drawn in favor of the nonmoving party.  Anderson, 477 U.S. at 255; Gibson v. Cnty. of Washoe, 290 F.3d 1175, 1180 (9th Cir. 2002).

## DISCUSSION

Defendants move for summary judgment on each of Neighorn's four claims for relief. The court examines the arguments presented on each claim in turn.

## I.   FCA Retaliation Claim

Neighorn alleges he suffered retaliation as a result of his complaints about Rotech's unwritten "porching" policy and Coghill's failure to ensure the Central Point office met JCAHO standards, and that such retaliation constitutes a violation of the FCA. *See* 31 U.S.C. § 3730(h).

The FCA was enacted during the Civil War for the purpose of combating "widespread fraud by government contractors who were submitting inflated invoices and shipping faulty goods to the government." U.S. ex rel. Hopper v. Anton, 91 F.3d 1261, 1265–66 (9th Cir. 1996). Seven types of conduct are made actionable under the FCA. 31 U.S.C. §§ 3729(a)(1)-(7). Of these, three require that the misconduct involve an actual demand for payment, §§ 3129(a)(1)-(3), while the remaining four provide that the "false claim" lies in the fraudulent use of a receipt, §§ 3129(a)(4)-(5), the unauthorized purchase of government property, § 3729(a)(6), or the use of a "false record or statement" to avoid payment to the government, § 3729(a)(7). Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055-56 (9th Cir. 2011). The FCA provides that a person may file a qui tam action on behalf of the person and the federal government for any violation of section 3729. 31 U.S.C. § 3730(b).

Liability for FCA violations attaches not only as the result of the actual submission of a false claim, but also under the doctrines of false certification and promissory fraud. U.S. ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1171 (9th Cir. 2006) (internal citation omitted). Under the doctrine of false certification, liability attaches as the result of the party's false certification of "compliance with a statute or regulation as a condition to government payment." Id. The false certification may either be express or implied. Id.; Ebeid ex rel. U.S. v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010) (recognizing the implied false certification theory). By contrast, the doctrine of promissory fraud attaches liability "to each claim submitted to the

government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct." Hendow, 461 F.3d at 1173. Unlike the false certification doctrine, liability under the promissory fraud doctrine attaches not as a result of a false statement of compliance with government regulations, but as the result of the original fraud perpetrated in securing the government contract or benefit. Id. Claims under either doctrine must establish four elements: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due. Id. at 1174.

In this case, Neighorn does not argue Rotech *actually* submitted false claims to the government. Instead, he argues Rotech "threatened, disciplined, harassed, discharged, and in other manners retaliated and discriminated against" him in violation of the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h).

### FCA Retaliation

The False Claims Amendments Act of 1986 amended the FCA to provide relief to employees subjected to retaliation as the result of the employee's "lawful acts" done in furtherance of the FCA. Pub.L. No. 99–562, § 4, 100 Stat. 3153, 3157-58 (*codified at* 31 U.S.C. § 3730(h)). Liability under 31 U.S.C. § 3730(h) attaches, not as a result of the employer's actual or suspected fraud, but as a result of an employer's "retaliatory act against the investigating employee." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1103 (9th Cir. 2008). Therefore, the plaintiff need not show that the defendant *actually* submitted a false claim in violation of 31 U.S.C. § 3729, only that he *suspected* the defendant submitted a false claim. Id. (emphasis added) (*citing* Graham Cnty. Soil & Water Cons. Dist. v. U.S. ex rel. Wilson, 545 U.S. 409, 416-17 & n. 1, 125 S.Ct. 2444 (2005)). A plaintiff alleging a retaliation claim under §

3730(h) must show that: (1) he was engaging in conduct protected under the FCA; (2) his employer knew he was engaging such conduct; and (3) his employer discriminated against him because of his protected activity.  Id. (*citing* Moore v. Cal. Inst. of Tech. Jet Propulsion Lab., 275 F.3d 838, 846 (9th Cir. 2002)).  The plaintiff need not be specifically aware of the FCA; he need only "be investigating matters which are calculated, or reasonably could lead, to a viable FCA Action."  Moore, 275 F.3d at 845 (*citing* Hopper, 91 F.3d at1269).

If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action.  U.S. ex rel. Berglund v. Boeing Co., --- F.Supp.2d ---, ---, 2011 WL 6182109, at * 17-18 (D. Or. Dec. 13, 2011) (applying the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973) to the plaintiff's FCA retaliation claim, reasoning that although the Ninth Circuit has not expressly determined that this analysis applies to FCA retaliation claims, "every court to address this issue directly has concluded an affirmative defense is available to the employer") (internal citations omitted).  If the defendant successfully rebuts the inference of retaliation, the burden of production shifts back to the plaintiff to show that the defendant's explanation is merely a pretext for impermissible retaliation.  Id. at ---, * 18.

## A. Neighorn did not engage in conduct protected under the FCA

For purposes of the first element, Neighorn engaged in protected activity under the FCA if he reasonably believed that Rotech was committing fraud against the government, and he investigated that fraud.  *See* Sicilia v. Boeing Co., 775 F.Supp.2d 1243, 1249 (W.D. Wash. 2011) (*citing* Mendiondo, 521 F.3d at 1104).  Whether Neighorn's belief that Rotech was committing fraud was reasonable "contains both a subjective and objective element:  (1) whether the [he] in good faith believed that fraud was taking place and (2) whether 'a reasonable employee in the

same or similar circumstances might believe, that the employer [was] possibly committing fraud against the government.'" Id. (*quoting* Moore, 275 F.3d at 845–846).

### 1. Neighorn's belief that Rotech was defrauding the government was not "reasonable"

Although there are genuine issues of material fact regarding whether Neighorn had a good faith belief that Rotech was perpetuating fraud on the government, that belief was not objectively reasonable.

### a. Subjective Prong

There are issues of material fact regarding whether Neighorn had a good faith belief that Rotech was perpetuating fraud on the government.  Rotech argues Neighorn could not in good faith believe that Rotech was actually submitting false claims to the government because (1) his complaints concerned Coghill's perceived failures as a manager, not fraud on the government; (2) he knew patients received the products Rotech billed for even when the patient did not sign the delivery ticket; (3) not only was he unable to identify a single instance when Rotech billed the government for products or services it did not actually provide, his own notes in the files of the patients that he specifically identified as examples of false claims disproved his suspicions; (3) notwithstanding the "tracing paper" incident, he admits he never actually saw Coghill forge patient or physician signatures on any document, much less a document relating to claims for payment presented to the government; and (4) he had no knowledge of Rotech's billing process nor did he ever review Rotech's billing records, therefore he had no basis for assuming that failure to obtain a patient signature for a delivery signaled fraudulent billing. (Defs' Corr. Mem., pp. 12-17).  Rotech further argues Neighorn's "implied false certification" theory fails because he has failed to identify any basis for his belief that obtaining the patient's signature on the delivery ticket is a condition of receiving payment from the government.  (Reply Supp. Defs'

Mot. Summ. J., Dckt. # 60, pp. 9, ECF pp. 15).  In sum, Rotech argues that the "fraud" Neighorn

suspected is not actionable under the FCA and his conduct amounts to no more than the passing

on of unsubstantiated rumors, thus his conduct is not protected under the FCA.

Nevertheless, the court finds that Neighorn has sufficiently raised an issue of material

fact regarding whether he subjectively believed Rotech was perpetuating fraud on the

government.

### i.    Patient signatures on delivery tickets

Rotech's own exhibits establish that the Compliance training Neighorn received

identified "mak[ing] a false record/statement to get a false/fraudulent claim paid" as one of the

"key" elements of an FCA claim, followed by an admonishments that failure to obtain the

patient's signature on the delivery ticket "will result in delayed billing and/or possible refunds,"

and that "[p]roper documentation of all equipment and supplies delivered is the third step for

successful reimbursement."  (Menchen Decl., Exs. B & C, Dckt. # 42-1, pp. 6, 10, 15, 21).  As

Rotech points out, Neighorn knew that PSTs did not always obtain the patient's signature on the

delivery ticket, but was not involved with the billing process, did not review billing records, and

did not know what role if any the delivery tickets played in the billing process.  Thus, while his

training informed him that signed delivery tickets were required for Rotech to bill the

government, his experience taught him that patient signatures were not always obtained.

At his deposition, Neighorn testified that only Windsor and Coghill handled billing

responsibilities at the Central Point office.  He further testified that Windsor told him Coghill

was forging signatures on certificates of medical necessity ("CMN"), (Neighorn Dep., Dckt. #

44-1, pp. 41-42), that Coghill once presented him with what appeared to be a forged patient's

signature on "tracing paper" and asked his opinion of its likeness, (id., pp. 55-58), and that while

he never actually witnessed Coghill forging a patient's or physician's signature, Windsor told him this was a "regular occurrence," (id., pp. 57-58). Prior to his termination, Neighorn submitted a complaint to the JCAHO when he felt Rotech was not responding to in his complaints. (Id., pp. 75). He made inquiries about possible violations of Occupational Safety and Health Administration regulations and Oregon state laws regarding the transportation of oxygen. (Id., pp. 113). He testified at his deposition that he believed he had sufficiently reported fraud by reporting his belief that Coghill "was forging signatures on CMNs, and that other signatures possibly were forged, as well." (Id., pp. 116). He also sought legal counsel prior to his termination. (Neighorn Dep., Dckt. # 54-3, pp. 7). These actions all support the inference that Neighorn subjectively believed that Rotech was defrauding the government.

It is difficult to conceive how Neighorn could simultaneously believe that scribbling the "left on porch" notation in the patient signature block of the delivery ticket was neither a forgery nor a violation of Rotech policy on his part, but billing for products delivered in this manner constituted fraud on the government on Rotech's part. However, construing all inferences in his favor, the court finds there is a genuine issue of material fact regarding whether Neighorn had a subjective good faith belief that Rotech was possibly defrauding the government by billing for products and services without obtaining a delivery ticket signed by the patient.

### ii.    JCAHO standards violations

Neighorn argues he believed that Rotech was required to comply with JCAHO standards as a condition of payment under its contract with the government, and accordingly believed that Rotech was defrauding the government by billing for products and services when it knew it was violating multiple JCAHO standards. Specifically, Neighorn argues that Rotech, through Coghill, violated JCAHO standards by falsifying inventory records, falsifying records of

mandatory "ride alongs" with PSTs, failing to ensure the Central Point location had adequate

smoke detectors and fire extinguishers, allowing patients to continue to receive oxygen despite

non-compliance with safety standards, allowing untrained and uncertified employees to perform

CPAP and BiPAP set ups, allowing non-employees to access equipment and patient files in the

restricted areas of the Central Point office and to assist with delivery and set up, and allowing

oxygen to be transported in improperly licensed and non-conforming vehicles. Neighorn has

submitted evidence establishing that he reported these violations to the JCAHO, that the

violations he observed and reported were validated in the JCAHO's May 2010 audit of Rotech's

Central Point office, and that Rotech perceived the JCAHO's audit results as creating a risk that

Rotech as an organization could lose its JCAHO accreditation.

Rotech argues Neighorn's purpose in reporting the JCAHO standards violations was not

to report illegality or fraud on the government, but to question Coghill's performance of her

duties as manager of the Central Point office. If that were true, Neighorn's complaints would not

constitute a good faith belief that Rotech was violating the FCA and he would not have an

actionable FCA retaliation claim. Although the record indicates that Coghill's performance or

non-performance of her duties was certainly one of Neighorn's concerns, his complaints also

appear to have been made to inform Rotech of perceived violations of safety standards which

Neighorn believed to be conditions of Rotech's contract with the VA. The court thus cannot

conclude that no reasonable jury could find that Neighorn's reports were made only to report his

manager's dereliction of her duties. Drawing all reasonable inferences in his favor, the court

finds there is a genuine issue of material fact regarding whether Neighorn had a subjective good

faith belief that Rotech was possibly defrauding the government by billing for products and

services while knowing it was violating JCAHO standards.

### b. Objective Prong

Even assuming that Neighorn genuinely believed that Rotech was engaging in the type of fraud made actionable by the FCA, this is insufficient, by itself, to state a claim for retaliation under 31 U.S.C. § 3730(h). To survive summary judgment, he must also show that his belief was objectively reasonable.

Neighorn's retaliation claim rests on the "implied false certification" theory. "Implied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." Ebeid, 616 F.3d at 998. Neighorn argues Rotech was obligated to obtain signed delivery tickets as a condition to government payment under both the May 2008 CIA and its contract with the VA, and that it implicitly falsely certified it had done so each time it submitted a claim for payment to the VA. To demonstrate that his belief was objectively reasonable, Neighorn must establish that a reasonable employee in the same or similar circumstances might believe that Rotech (1) knowingly (2) made a false statement or engaged in a fraudulent course of conduct (3) that was material (4) to the government's decision to pay out money or forfeit moneys due. *See* Hendow, 461 F.3d at 1174 (stating the elements of a FCA violation under the false certification theory); Sicilia, 775 F.Supp.2d at 1253 (a plaintiff bringing a FCA retaliation claim need not prove the elements of a FCA violation; however, "the degree to which plaintiff's suspicion of fraud corresponds with what the defendants were actually doing is relevant to whether plaintiff's suspicion of fraud was reasonable") (internal citations omitted).

For a statement or course of conduct to be material to the government's decision to pay out or forfeit moneys, the statement or conduct must be a condition of payment. Hendow, 461

F.3d at 1175-77.[6] As described below, neither the CIA nor the VA contract requires Rotech to obtain a delivery ticket signed by the patient as a condition of payment. Therefore, Neighorn's belief that Rotech was perpetuating fraud against the government by submitting claims for payment without obtaining a signed delivery ticket is objectively unreasonable.

### i. The CIA

The purpose of the May 2008 CIA is to "promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs." (Ayers Decl., Ex. 1, Dckt. # 54.7, pp. 3). In relevant part, the CIA requires Rotech to "maintain and implement" written policies and procedures addressing the federal health care program requirements governing coverage and reimbursement of oxygen, and the proper completion of the documentation necessary to support the submission and reimbursement of claims. (Id., pp. 8). Rotech is also required to provide all persons "involved in billing, coding and claims submission, or the preparation or completion of documentation to support claims for reimbursement" with training on those subjects. (Id., pp. 9). As part of its review procedures, the CIA requires Rotech to retain the documentation necessary to support all paid claims, and provides that failure to do so "shall be considered an error and the total reimbursement received by Rotech for such Paid Claim shall be deemed an Overpayment." (Id., pp. 40).

Thus, the CIA itself does not impose any documentation requirements as conditions of payment. Instead, it incorporates the documentation requirements established by federal health care programs and provides that where those requirements are not met, Rotech shall not be entitled to payment. The CIA itself therefore does not demonstrate any basis for Neighorn's

---

[6] The Ninth Circuit has held that an explicit statement is not necessary to make a statutory requirement a condition of payment. Hendow, 461 F.3d at 1177. However, it appears that in the context of contractual provisions, conditions of payment must be explicit. *See* Moore, 275 F3d at 846.

belief that Rotech was required to obtain delivery tickets signed by the patient as a condition of payment unless that condition is imposed by a federal health care program. For this, Neighorn relies exclusively on Rotech's contract with the VA.

## ii. The VA contract

Neighorn does not argue that signed delivery tickets are required by any statute, regulation or rule; instead, he argues that they are required under Rotech's contract with the VA. More particularly, he argues that although Rotech's contract with the VA does not specifically reference delivery tickets or patient signatures, it incorporates Rotech policies and JCAHO standards, both of which requires delivery tickets signed by the patient.

## A. Rotech policy

Neighorn argues the contract incorporates Rotech's Proof of Delivery policy by providing that documentation requirements are to be established by Rotech. Since Rotech's Proof of Delivery policy requires a delivery ticket signed by the patient as proof of delivery for all deliveries by Rotech employees and further states that no payer will be billed without proof of delivery, Neighorn argues the contract incorporates not only the policy's proof of delivery documentation requirement but also its provision that proof of delivery is a prerequisite for billing, therefore, payment under the VA contract is conditioned on signed delivery tickets.

Federal law controls Neighorn's interpretation because the contract was entered into pursuant to a federal scheme and the VA is a party. *See* Klamath Water Users Prot. Ass'n v. Patterson, 204 F.3d 1206, 1210 (9th Cir. 1999) (internal citation omitted), *cert. denied*, 531 U.S. 812, 121 S.Ct. 44 (2000). The court looks to general principles for guidance in interpreting the contract. Id. (*citing* Kennewick Irrigation Dist. v. U.S., 880 F.2d 1018, 1032 (9th Cir.1989)). The normal rule of construction is that contracts must be interpreted, if possible, so as to avoid

internal conflict. Trident Ctr. v. Conn. Gen. Life Ins. Co., 847 F.2d 564, 566 (9th Cir. 1988). "A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." Klamath Water Users Prot. Ass'n, 204 F.3d at 1210 (*citing* Kennewick, 880 F.2d at 1032). "Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself." Id. (*citing* Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1549 (9th Cir. 1989)). The plain language of the contract should be considered first whenever possible. Id. (internal citations omitted). "The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous; it is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation." Id. (*citing* Kennewick, 880 F.2d at 1032).

By its plain language, the contract incorporates the delivery documentation requirements set out in Rotech's Proof of Delivery policy. In the table titled "Home Oxygen Services Roles and Responsibilities," the contract provides that documentation requirements and timeframes are a "service provided solely by [Rotech]" and are to be maintained by Rotech "to meet current JCAHO standards and as stipulated in the contract." (Menchen Decl., Ex. D, Dckt. # 42-2, pp. 56). Neighorn argues that delivery tickets signed by the patient are a condition of payment under the VA contract because (1) the VA contract incorporates Rotech's Proof of Delivery policy, (2) the Proof of Delivery Policy provides that no payer will be billed without proof of delivery, and (3) proof of delivery in the case of deliveries by a Rotech employee consists of a delivery ticket signed by the patient. In other words, Neighorn argues that, despite its plain meaning, the phrase limiting Rotech's responsibility to "documentation requirements and time frames" is ambiguous and must be interpreted to mean that Rotech shall be responsible not only for documentation

requirements and timeframes, but documentation requirements for billing as well. This interpretation is inconsistent with the plain language of the contract and its provisions regarding invoicing and payment.

First, the "roles and responsibilities" table which requires Rotech to establish documentation requirements and timeframes separately addresses "procedures for determining charges and reimbursement" by providing that Rotech "will submit billing reports monthly as stipulated in this contract." (Id.). The contract's terms and conditions related to invoicing require that that (1) Rotech must submit a monthly invoice for the products and services provided to each VA patient; (2) the invoice must include the VA contract number, patient name, last four digits of the patient's social security number, an itemized list of the equipment in place and the supplies used; (3) the VA will approve the invoice and pay Rotech after comparing the invoice with its records. (Id., pp. 38, 58). With regard to payment, the contract provides that "[p]ayment shall be made for items accepted by the Government *that have been delivered* to the delivery destinations set forth in this contract." (Id., pp. 59) (emphasis added). Finally, with regard to acceptance, the contract provides that "the Government may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price." (Id., pp. 58). The contract thus expressly provides that invoicing and payment shall conform to the procedures established by the contract itself, and does not afford Rotech any authority to amend or add to those procedures. The procedures set out in the contract do not condition payment on signed delivery tickets, only delivery and acceptance. Therefore, the contract does not support Neighorn's argument that signed delivery tickets are a condition of payment.

Moreover, the contract explicitly contemplates situations where a patient is not home to receive a scheduled delivery. Part II of the contract, titled "Scope of Contract and Statement of Work," provides that deliveries shall not be left unattended at a patient's home. (Menchen Decl., Ex. D, Dckt. # 42-2, pp. 40). However, unlike other provisions of the contract, (*see, e.g.*, id. at pp. 38 (providing that failure to perform switch-outs within the prescribed time period "will result in a forfeit of payment to the provider . . . for every day thereafter until switch-out is complete.")), no penalty is imposed for leaving deliveries unattended. Instead, the contract provides only that should Rotech fail to make "valid and documented attempts" to contact the patient, the VA "reserves the right to call in a third party and bill [Rotech] if [Rotech] fails to perform." (Id., pp. 40). In other words, Rotech's penalty for leaving product unattended is that it must bear the cost of any product not actually received by the patient as well as any cost incurred by the government in obtaining the product from another provider.

Neighorn nevertheless argues that the VA actually requires signed delivery tickets as a condition of payment, relying on the fact that Rotech required the Central Point office to attempt to get patient signature validations for the 507 documents identified as having questionable signatures and refunded monies to the VA only for those deliveries for which it was unable to obtain patient signature validations. His fails to provide any evidence in support of his argument. Rotech, on the other hand, has provided evidence in the form of the sworn declaration of its Chief Compliance Officer, Robin Menchen, that it voluntarily elected to refund the monies.

Furthermore, the patient signature validation process is entirely consistent with the contract's terms and provisions. As described above, the contract provides that the VA may at its discretion require Rotech to cure non-performing goods or services before paying for them. Because the contract incorporates the Proof of Delivery policy's *documentation* requirements,

deliveries not evidenced by a signed delivery ticket are technically nonconforming, therefore the VA could, at its discretion, require Rotech to attempt to secure patient signature validation for those deliveries. However, the contract further provides that once the government has accepted the goods and services, payment is contingent only upon delivery, not the patient's signed receipt evidencing delivery. Because the VA had already accepted those deliveries and the products were actually delivered, Rotech had satisfied all of the conditions of *payment*, therefore, although a patient signature validation was unobtainable, the VA could not require a refund.

In sum, while Rotech's contract with the VA incorporates Rotech's policies regarding documentation requirements, it does not grant Rotech the authority to establish billing requirements or set conditions of payment. Therefore, while delivery tickets signed by the patient are a prerequisite to billing under Rotech's internal process, the contract with the VA does not require delivery tickets signed by the patient as a condition of payment.

## B. JCAHO standards

Neighorn next argues that the contract requires Rotech to comply with JCAHO standards; that JCAHO standards require, among other things, that Rotech maintain complete and accurate patient files; and that "incomplete or falsified signatures" on delivery tickets do not comply with JCAHO standards. (Pl's Surreply, Dckt. # 69, pp. 6, 17, ECF pp. 7, 18). Neighorn has failed to unearth any evidence to support his argument.

First, while the contract may generally require that Rotech comply with JCAHO standards, that directive must be read with reference to the specific procedures outlined in the contract with respect to invoicing and payment which, as described above, do not require Rotech to obtain a delivery ticket signed by the patient. Second, while the contract provides that Rotech "shall furnish, install and service" oxygen and related equipment according to a number of

standards and guidelines, including JCAHO standards, (Menchen Decl., Ex. D, Dckt. # 44-2, pp. 43), Neighorn has failed to demonstrate any basis for his belief that JCAHO standards require Rotech to obtain a delivery ticket signed by the patient as part of its patient file documentation. He does not cite the standards with particularity in his briefing, nor does he attach them as exhibits to his opposition, nor does he cite or otherwise identify any statute, rule or regulation that codifies these standards. In short, he provides the court with no guidance concerning which JCAHO standards are applicable to Rotech or what those standards specifically require.

Absent evidence that JCAHO standards specifically require that deliveries be documented by a receipt signed by the patient, the contract's requirement that Rotech comply with JCAHO standards requires only that Rotech provide services according to a particular standard of care. *Compare* Hendow, 461 F.3d at 1175-77 (requirement that defendant comply with incentive compensation ban was not an "amorphous duty" but a "specific requirement"), *with* Mikes v. Straus, 274 F.3d 687, 702 (2nd Cir. 2001) (statutory requirement that defendant "assure" that the services provided "be of a quality which meets professionally recognized standards of health care" imposed a duty to maintain a standard of care). By undertaking to maintain that standard of care, Rotech's duty was not to promise *compliance* with JCAHO standards, but rather to promise *assurance* of compliance with JCAHO standards. *See* Hendow, 461 F.3d at 1177. Absent evidence that Rotech "affirmatively and knowingly" ignored its duty to assure compliance with JCAHO standards, its failure to actually attain that standard does not constitute a breach of a condition of payment. *See* Hendow, 461 F.3d at 1177.

Here, the VA contract establishes a number of "performance objectives" and provides that Rotech's performance shall be measured according to the contract's Quality Assurance Surveillance Plan ("QASP"). (Menchen Decl., Ex. D, Dckt. # 44-2, pp. 52-54). The QASP

seeks to achieve the desired quality standard by limiting the government's role to monitoring Rotech's performance and assigning Rotech the responsibility for management and quality assurance, with the goal of achieving a "self-correcting" contract by requiring Rotech to "develop a comprehensive program of inspections and monitory actions." (Id., pp. 52). The record shows that Rotech has issued a Code of Conduct setting forth the general duties and responsibilities of its employees, which it supplements with policies and procedures addressing certain specific functions of its employees. Employees are provided an Employee Handbook and are required to certify in writing that they have received and read the Code of Conduct and the policies and procedures applicable to their position. Rotech's Compliance department monitors, evaluates, and amends its policies and procedures to ensure they are effective. Rotech has developed general training as well as specific training tailored to its employees' various job duties, which it administers through its on-site managerial staff and computerized training modules, which Rotech's Compliance department monitors to ensure the training is completed. Finally, Rotech requires its on-site managers to conduct monthly sample audits of the location's files to check for errors and, pursuant to the 2008 CIA, has retained an independent review organization to conduct periodic audits of sample claims for the past three years. Thus, by all appearances, although Rotech may have failed to meet the VA contract's standard of care at its Central Point location, this failure occurred despite Rotech's due diligence to assure compliance.

Neighorn nevertheless argues that Rotech issued its Code of Conduct and its policies and procedures only in order to create the appearance that it was assuring compliance without ever intending to perform that duty. Specifically, he argues Rotech affirmatively and knowingly instructed its employees to disregard its written policies when doing so financially benefitted Rotech, as in the case of its practice of instructing PSTs to "porch" products in violation of the

Proof of Delivery policy. He further argues that when employees reported policy violations, Rotech seized on the reports as opportunities to further the appearance of compliance by performing a perfunctory Compliance investigations and then firing the responsible on-site employees for allegedly violating Rotech policy, without ever instituting changes to its quality assurance or auditing processes that would actually improve or achieve compliance. He argues this deception is evidenced by the fact that although the "porching" practice was rampant at Rotech locations all across the nation, Rotech's internal audits never discovered a single "delivery ticket signature impropriety" and that its disciplinary response to reported violations has disproportionately targeted the lowest level employees, the PSTs, and excluded the on-site employees responsible for quality assurance and billing—the CSRs and LCMs.

The evidence Neighorn relies on does not support of his allegations. To the contrary, record establishes that between November 2009 and August 2010, Rotech received reports from 13 of its 415 locations that employees were "porching" products and/or falsifying patient signatures. (Thelen Decl., Dckt. # 44, ¶ 20 & Ex. 19, Dckt. # 44-3). Excluding the Central Point incidence, three instances were discovered by CSRs, six were discovered by LCMs, two were reported by PSTs, and one was reported anonymously to Rotech's hotline. (Suppl. Thelen Decl., Dckt. # 65, ¶ 9 & Ex. 42, Dckt. # 65-8). One CSR supervisor and two LCMs were terminated as a result of these reports, as were eleven PSTs, including Neighorn and Stahl. (Id.). In each instance, the employee admitted to "falsifying signatures" or, in the case of one LCM, knowing that PSTs were falsifying signatures and failing to report it. (Id.).

Rotech's Compliance department investigated each incident and reported the results of their investigations in memoranda to Wayne Bradberry, Rotech's Director of Compliance, and others. (Thelen Decl., Dckt. # 44, ¶ 20 & Ex. 19, Dckt. # 44-3). By email dated March 16, 2010,

Mike Dobbs, Rotech's Chief Operating Officer, scheduled a meeting with Bradberry, Robin

Menchen, Rotech's Chief Compliance Officer, and others, to discuss the appropriate remedial

action to address the recent alarming trend of "inappropriate behavior with respect to patient and

physician signatures." (Thelen Decl., Dckt. # 44, ¶ 21 & Ex. 20, Dckt. # 44-4, pp. 1). On March

22, 2010, Rotech issued a company-wide Compliance alert by way of a "Message of the Week,"

informing employees that falsification of patient signatures on delivery tickets was grounds for

termination, and that "porching" products was "not appropriate, even with the patient's

permission." (Id., ¶ 22 Ex. 21, Dckt. # 44-4, pp. 2). After this message was issued, Rotech

continued to investigate reports of violations and terminated each employee, regardless of

position, who admitted to falsifying signatures. (*See* Suppl. Thelen Decl., Dckt. # 65, ¶ 9 & Ex.

42, Dckt. # 65-8; Thelen Decl., Dckt. # 44, ¶ 20 & Ex. 19, Dckt. # 44-3)

In sum, while the VA contract requires Rotech to provide oxygen services according to

JCAHO standards, there is no evidence that JCAHO standards require that Rotech obtain

delivery tickets signed by the patient. Furthermore, nothing in the record would allow a

reasonable jury to conclude that Rotech ignored its duty to assure compliance with JCAHO

standards. Therefore, although Rotech may have actually failed to comply with JCAHO

standards at the Central Point location, that failure does not, as a matter of law, constitute a

breach of a condition of payment.

### Conclusion

In sum, and for the reasons stated above, neither the CIA nor the VA contract requires

Rotech to obtain a delivery ticket signed by the patient as a condition of payment. Therefore,

although Neighorn may have subjectively believed that Rotech was defrauding the government

by billing for products and services without obtaining a delivery ticket signed by the patient, that belief was not objectively reasonable.

## 2. Neighorn did not "investigate" fraud

Neighorn argues that even if the fraud he suspected was not actionable, his conduct in reporting the suspected fraud is still "protected activity" because the FCA does not require that he investigate the suspected fraud himself, only that he report the suspected wrongdoing in a manner that prompts an investigation. In other words, Neighorn contends that the FCA protects employees "who merely complain to or seek to prompt investigations by their employers about suspected wrongdoing" regardless of whether the suspected fraud is actionable. (Pl's Opp'n Summ. J., Dckt. # 53, pp. 26, 31, ECF pp. 31, 36). Rotech, on the other hand, argues that the FCA demands more than the mere reporting of unsubstantiated rumors and hearsay and, because Neighorn made absolutely no effort to determine whether the fraud he suspected was actually occurring, his conduct is not protected under the FCA.

The issue of whether a plaintiff's conduct constitutes protected activity when the fraud he suspects is not actionable under the FCA and his investigation could not reasonably lead to a viable FCA action has not been decided by the Ninth Circuit. *See* Cafasso, 637 F.3d at 1060 n. 12 (declining to decide this precise issue). However, the Ninth Circuit has held that "[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA." Hopper, 91 F.3d at 1266. Therefore, a plaintiff bringing an FCA retaliation claim must show actual or potential actions by the employer that "reasonably could lead to a *viable* FCA claim." Hopper, 91 F.3d at 1269 (emphasis added). In Moore, the Ninth Circuit reaffirmed this standard and clarified that for the action to be viable, the employee's good faith subjective belief that his employer is committing fraud must also be objectively reasonable. 275 F.3d at 845. Thus, it

appears the employee's suspicion of fraud must correlate with what the employer is actually doing in order for his conduct to be protected under the FCA. *See* Sicilia, 775 F.Supp.2d at 1253. Otherwise, an employee's subjective belief that his employer was committing fraud on the government would be sufficient, by itself, to bring his conduct under the umbrella of protected activity, regardless of whether or not that belief was objectively reasonable. Id..

As described above, had Neighorn investigated his belief that Rotech was committing fraud on the government by billing for products delivered in violation of Rotech's Proof of Delivery policy, he would have discovered that a delivery ticket signed by the patient was merely an internal billing process prerequisite, not a condition of payment under Rotech's contract with the VA. He did not do so, but proceeded instead solely on his own subjective good faith belief. While his desire to correct the policy violations he observed is commendable, those violations lack the requisite nexus to the FCA, therefore, he did not act in furtherance of the FCA by reporting them.

## Conclusion

For the reasons stated above, Neighorn did not engage in activity protected under the FCA when he filed his internal complaint with Rotech, participated in the ensuing Compliance investigation, or when he filed a complaint with the JCAHO. He has therefore failed to establish a prima facie case of retaliation under 31 U.S.C. § 3730(h). Accordingly, Rotech's motion for summary judgment is GRANTED with respect to Neighorn's FCA retaliation claim.

## II. Oregon's Whistleblower Protection Statute

Neighorn's second claim alleges that Rotech retaliated against him in violation of ORS § 659A.199 for reporting what he in good faith believed to be violations of the FCA and the

Page 49 – ORDER

Oregon False Claims Act ("OFCA"), H.B. 2264, 75th Leg. Assemb., Reg. Sess. (Or. 2009)

(*codified at* OR. REV. STAT. § 180.750, *et seq.*). (Am. Compl., Dckt. # 72, ¶ 57).

The Oregon legislature enacted ORS § 659A.199 in 2009 to extend "whistleblowing"

protections to private sector employees. H.B. 3162, 75th Leg. Assemb., Reg. Sess. (Or. 2009)

(*codified at* OR. REV. STAT. § 659A.199). The statute provides, in relevant part:

> "It is an unlawful employment practice for an employer to discharge, demote,
> suspend or in any manner discriminate or retaliate against an employee with
> regard to promotion, compensation or other terms, conditions or privileges of
> employment *for the reason that the employee has in good faith reported
> information that the employee believes is evidence of a violation of a state or
> federal law, rule or regulation.*"

OR. REV. STAT. § 659A.199(1) (emphasis added). Although Oregon courts do not use the

McDonnell Douglas/Burdine[7] burden-shifting framework to analyze retaliation claims, that

framework is a procedural device, not a substantive rule. Snead v. Metro. Prop. & Cas. Ins. Co.,

237 F.3d 1080, 1090-93 (9th Cir. 2001). Neighorn's claim under ORS § 659A.199 must

therefore be analyzed under this framework. *See* Lucke v. Multnomah Cnty., No. CV-06-1149-

ST, 2008 WL 4372882, at * 23 (D. Or. Sept. 22, 2008); Villigrana v. Collins Pine Co., Civil No.

06-1628-CL, 2008 WL 140723, at * 1 (D. Or. Jan. 11, 2008).

To establish a prima facie case of retaliation under ORS § 659A.199, a plaintiff must

show that he (1) engaged in a protected activity, (2) suffered an adverse employment decision,

and (3) there was a causal link between the protected activity and the adverse employment

decision. Sandberg v. City of N. Plains, No. 10-CV-1273-HZ, 2012 WL 602434, at * 6 (D. Or.

Feb. 22, 2012) (*citing* Ruggles v. Cal. Polytechnic State Univ., 797 F.2d 782, 785 (9th Cir.

1986); Shultz v. Multnomah Cnty., No. 08–CV–886–BR, 2009 WL 1476689, at *13 (D. Or.

2009)); *see also* Merrill v. M.I.T.C.H. Charter School Tigard, Civ. No. 10–219–HA, 2011 WL

---

[7] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973); Texas Dep't of Cmty.
Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089 (1981).

1457461, * 8 (D. Or. Apr. 4, 2011) (internal citations omitted). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to rebut the inference of retaliation by offering a legitimate, non-discriminatory reason for the employee's termination. If the defendant successfully rebuts the inference of retaliation, the burden of production shifts back to the plaintiff to show that the defendant's explanation is merely a pretext for impermissible retaliation. Id. at ---, * 18.

## A.  Neighorn engaged in protected activity

For the purposes of ORS § 659A.199, Neighorn engaged in protected activity. ORS § 659A.199 requires only that the employee reports in good faith information that the *employee believes* is a violation of state or federal law, thus, the employee "need not be objectively correct about the existence of a statutory violation to sufficiently state a prima facie claim of retaliation." Krouse v. Ply Gem Pac. Windows Corp., 803 F.Supp.2d 1220, 1228 (D. Or. 2011) (*citing* Yeager v. Providence Health Sys. Or., 195 Or. App. 134, 96 P.3d 862, 866 (2004)). As discussed above in Section I(A)(1)(a), there are issues of material fact regarding whether Neighorn had a good faith belief that Rotech was perpetuating fraud on the government by billing for products and services without obtaining a delivery ticket signed by the patient. Although Neighorn's FCA retaliation claim fails because his subjective belief was not objectively reasonable, the same is not true of his state law retaliation claim. ORS § 659A.199 does not have an objective prong; it is sufficient that Neighorn subjectively believe that Rotech was violating state and federal law. Therefore, for the purposes of summary judgment, Neighorn has established that he engaged in protected activity under ORS § 659A.199 on at least two occasions: (1) when he made his initial internal complaint on March 2, 2010, and (2) on April 2, 2010, when he reported additional perceived violations.

## B. Neighorn suffered an adverse employment action

Neighorn argues he was subjected to numerous adverse employment actions, including Coghill's attempt to discipline him for the February 24, 2010, incident when he refused to leave oxygen tanks unattended at a patient's home; Coghill's refusal to provide him with a copy of his personnel file; Coghill and Windsor freezing him out of office meetings and generally refusing to assist him according to their duties after discovering that he had filed an internal complaint; and Rotech's decision to terminate his employment for reporting what he believed to be violations of federal and state law.

ORS § 659A.199 prohibits discrimination and retaliation with regard to the terms, conditions or privileges of employment. OR. REV. STAT. § 659A.199(1); *cf.* Steele v. Mayoral, 231 Or. App. 603, 220 P.3d 761, 770 (2009) (for a Title VII retaliation claim, the adverse action must be material, meaning it might dissuade a reasonable employee in the same or similar circumstances from making or supporting a charge of discrimination, however, it need not affect the terms or conditions of employment) (*citing* Burlington N. & S.F.R. Co. v. White, 548 U.S. 53, 64, 126 S.Ct. 2405 (2006)). In this case, only Neighorn's termination affected the terms and conditions of his employment and thus constitutes an adverse employment action.

While Neighorn argues Coghill attempted to give him a disciplinary warning in retaliation for the February 24, 2010, incident, that warning was never issued: Area Manager Fannin instructed Coghill to end the disciplinary meeting with Neighorn after he informed her of the circumstances surrounding the incident. Even assuming that this event constitutes an adverse employment action, there is no indication that it was material. Coghill's failed attempt to issue him a warning did not dissuade Neighorn from reporting what he believed to be violations of state and federal law. To the contrary, he made his initial complaint of what he perceived to be

Page 52 – ORDER

violations of state and federal law on March 2, 2010, within a week of the February 24 incident

involving Coghill.

Likewise, while it appears that Coghill and Windsor may have treated Neighorn with

hostility because of his March 2, 2010, complaint, there is no indication that this behavior

materially affected the terms and conditions of his employment. There is no allegation that his

hours or pay were reduced, or that his schedule or route were changed. While Neighorn felt

talked over and ignored in meetings, experienced some difficulties with missed messages and

misplaced files, and felt he was treated rudely, the conduct he describes simply does not rise to

the level of actionable retaliation under ORS § 659A.199. And, although Windsor's and

Coghill's attitudes towards him appears to have genuinely caused Neighorn to feel

uncomfortable, unhappy, and stressed, he continued to follow up on his complaints, reporting

additional violations on April 2 and filing his complaint with the JCAHO on April 3.

For the reasons described above, the court finds a genuine question of material fact exists

as to whether Neighorn suffered an adverse employment action with respect to his termination

only.

**C. Neighorn has shown sufficient evidence to support an inference of causation**

Neighorn argues, in part, that a retaliatory inference may rightly be drawn from the

timing of his internal report and Rotech's decision to terminate him. Under the McDonnell

Doughlas/Burdine framework, timing alone may be sufficient to support the inference of a

retaliatory motive if the protected activity and the allegedly retaliatory employment action are

sufficiently close in time. *Compare* Thomas v. City of Beaverton, 379 F.3d 802, 812 (9th Cir.

2004) (evidence sufficient to support inference of causation where adverse employment action

occurred seven weeks after the employee's protected activity) (internal citations omitted) *with*

Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1035 (9th Cir. 2006) (eight month gap insufficient to support an inference of retaliatory motive). Close temporal proximity between an employee's protected activity and an adverse employment action is also evidence supporting the inference of retaliation under the "substantial factor" test employed by Oregon courts. *See* Huber v. Oregon Dept. of Educ., 235 Or. App. 230, 230 P.3d 937, 944 (2010) (evidence that the plaintiff was placed on administrative leave two weeks after filing a complaint about substandard nursing practices with one state agency and reporting that he intended to file a complaint with a second state agency supported the inference of retaliatory intent) (*citing* Herbert v. Altimeter, Inc., 230 Or.App. 715, 722, 218 P.3d 542 (2009))

Here, Rotech asserts it decided to terminate Neighorn's employment at some time prior to March 18, 2010. (Defs' Corr. Mem., pp. 9). That assertion is supported by the record. Thus, Rotech decided to terminate Neighorn only slightly more than two weeks after he reported the suspected FCA violation, and within nine days of the Compliance investigators' first and only interview with him. Although minimal, this evidence is sufficient on summary judgment to raise the inference of a retaliatory motive.

## D. Rotech has failed to rebut the inference of retaliation arising from Neighorn's prima facie case

Rotech argues any inference of retaliation is rebutted by its legitimate, non-retaliatory reason for terminating Neighorn: his admission that he falsified patient signatures. The record, however, demonstrates that an issue of fact exists both with respect to whether Neighorn actually made this admission and whether he actually falsified patient signatures.

Although both the initial and final memoranda prepared by Rotech's Compliance investigators reported that Neighorn admitted to signing patient names, Neighorn denies ever making this statement and further denies that he ever forged patient signatures on delivery

tickets. During his deposition testimony, Neighorn admitted to scribbling "left on porch" notations on delivery tickets, but denied that in doing so he attempted or intended to forge the patient's signature. Neighorn was presented with multiple delivery tickets, some of which bore a signature, others of which bore the "left on porch" notation or something similar. (Thelen Decl., ¶ 34 & Ex. 33, Dckt. # 44-6, pp. 1-69). While he agreed that the "signatures" on some of these tickets were not made by the patient, Neighorn denied signing the specific examples provided to him. (*See* Defs' Corr. Mem., Dckt. # 51, pp. 24, ECF pp. 30). He also denied that he ever told the Compliance investigators that he had signed patient names. This testimony is supported by the note he handwrote on the report documenting his termination, denying that he ever forged patient names or admitted to the Compliance investigators that he had done so. The issue of whether Neighorn admitted that he falsified patient signatures is therefore directly disputed. Accordingly, a question of fact precludes the determination that Rotech has offered a legitimate, non-retaliatory reason for terminating his employment.

## E. Neighorn has produced evidence of pretext

The court first assumes that Rotech argues that Neighorn's admission that he scribbled "left on porch" notations in the patient signature block constitutes an admission that he falsified patient signatures. The record shows that Rotech has administered different disciplinary action where an employee admits to "printing patient names" as opposed to "falsifying signatures." Specifically, following the March 2010 report of patient signature falsifications from the LCM of Rotech's Fargo, ND, office, one PST was terminated for admitting to falsifying signatures while a second PST was given a final written warning for "printing names." (Suppl. Thelen Decl., Dckt. # 65, ¶ 9 & Ex. 42, Dckt. # 65-8, pp. 2; Thelen Decl., ¶ 20 & Ex. 19, Dckt. # 44-3, pp. 23-32, 64-71). And following the April 2010 report of patient signature falsifications from the LCM

its St. Petersburg, FL, office, Rotech again terminated one PST for admitting to falsifying signatures while a second PST who admitted to "printing" the patient's name but was suspected of "signing recently" was given a final written warning. (Id.). Questions of fact therefore exists as to what constitutes "printing" versus "signing"; whether any scribbled notation, e.g. "left on porch," is sufficient to constitute "signing" or whether the notation must include the patient's name; and whether an employee's intent or purpose is relevant to whether a legible, but scribbled, notation of "left on porch" constitutes "signing." Therefore, a reasonable jury could conclude that Rotech's reason for discharging Neighorn is pretextual if the jury found that (1) Neighorn scribbled "left on porch" notations but never wrote a patient's name or, (2) if Neighorn did write a patient's name, his writing constitutes "printing" instead of "signing."

Finally, even if Rotech is understood to argue it terminated Neighorn for "porching" products—that is, for failing to *obtain* patient signatures on delivery tickets, as opposed to *falsifying* patient signatures—the result is the same. The only incident involving "porching" without an accompanying allegation of falsifying signatures occurred in May of 2010 at Rotech's Midvale, UT, location. (Suppl. Thelen Decl., ¶ 9 & Ex. 42, Dckt. # 65-8, pp. 3; Thelen Decl., ¶ 20 & Ex. 19, Dckt. # 44-3, pp. 96-104). In that instance, Rotech's Compliance investigators recommended that the PST be given a final written warning. (Thelen Decl., ¶ 20 & Ex. 19, Dckt. # 44-3, pp. 104). Furthermore, although Rotech's Code of Conduct requires mandatory disclosure of all known or suspected violations of Rotech policy, Rotech nevertheless elected not to terminate Coghill or Windsor despite the fact that they knew the "porching" practice was occurring and failure to report it. Moreover, in Coghill's case, she admittedly instructed the PSTs to "porch" products in certain situations where she felt it would be "acceptable." Thus, a reasonable jury might conclude that Rotech selectively terminated Neighorn, not because he

failed to comply with its Proof of Delivery policy, but for reporting what he in good faith believed to be violations of state and federal law.

In sum, on the evidence presented, the court concludes that a reasonable jury could find that Neighorn neither falsified a patient signature nor admitted to doing so. Therefore, Rotech has failed to meet its burden of rebutting the retaliatory inference arising from Neighorn's prima facie case.

## Conclusion

For the reasons stated above, a genuine issue of material fact precludes a determination as to whether Neighorn's good faith report suspected FCA violations was a motivating factor in Rotech's decision to terminate his employment. Therefore, Rotech's motion for summary judgment is DENIED with respect to Neighorn's retaliation claim under ORS § 659A.199.

## III. Common Law Wrongful Discharge

Neighorn's fourth claim alleges he was wrongfully discharged for reporting conduct that violated both Oregon and federal public policy: Rotech's alleged violation of the OFCA and FCA, and its failure to maintain the standard of care mandated by the JCAHO, the VA, and the CMS. Rotech argues these are the same allegations that form the basis of Neighorn's claim ORS § 659A.199, therefore, because ORS § 659A.199 provides an adequate remedy, his wrongful claim is precluded as a matter of law. Neighorn did not respond to Rotech's arguments in his initial response in opposition (Dckt. # 53) to Rotech's motion, at oral argument, or in his surreply (Dckt. # 69). Therefore, Rotech's motion for summary judgment on Neighorn's third claim for relief is unopposed.

Unless prohibited by a contractual, statutory, or constitutional requirement, an employer in Oregon may generally discharge an employee at any time and for any reason, provided that

the discharge does not otherwise fall within one of two recognized exceptions: (1) discharge for fulfilling an important public duty, and (2) discharge for exercising a job-related right that reflects an important public duty. Babick v. Or. Arena Corp., 333 Or 401, 40 P.2d 1059, 1062 & n. 2 (2002) (internal citations omitted). The tort of wrongful discharge was not intended to be a tort of general application, rather, it is an interstitial tort meant to provide a remedy when the conduct in question is unacceptable and no other remedy is available. Draper v. Astoria Sch. Dist. No. 1C, 995 F.Supp. 1122, 1127 (D. Or. 1998) (*citing* Walsh v. Consolidated Freightways, Inc., 278 Or. 347, 563 P.2d 1205, 1208 (1977)). The court in Draper therefore concluded that in Oregon, a plaintiff may not pursue a claim for common law discharge if (1) an existing remedy adequately protects the public interest in question, *or* (2) the legislature has intentionally abrogated the common law remedies by establishing an exclusive remedy regardless whether the courts perceive that remedy to be adequate. 995 F.Supp. at 1130-31 (emphasis added). The Oregon Court of Appeals subsequently held that the test is conjunctive; that is, the defendant must show *both* that the statutory remedy is adequate *and* that the legislature intended the statute to abrogate the common law. Olsen v. Deschutes Cnty., 204 Or. App. 7, 127 P.3d 655, 660 (2006), *rev. den.*, 341 Or. 80, 136 P.3d 1123 (2006). However, Olsen's conjunctive test has generally been rejected by the courts of this District as both inconsistent with Oregon Supreme Court precedent and an unnecessary expansion of the tort of wrongful discharge. *See, e.g.*, Reid v. Evergreen Aviation Ground Logistics Enters., Inc., Civil No. 07-1641-AC, 2009 WL 136019, at * 15-20 (D. Or. Jan. 20, 2009); Duran v. Window Prods., Inc., Civ. No. 10-125-ST, 2011 WL 1261190 (D. Or. Mar. 29, 2011)[8]; *but see* Krouse v. Ply Gem Pac. Windows Corp., 803 F. Supp.2d 1220, Civil No. 10-111-HA, 2011 WL 2971774, at *8 (D. Or. July 19, 2011).

---

[8] Adopting Magistrate Judge Stewart's Findings and Recommendation, Duran v. Window Prods., Inc., No. CV-10-125-ST, 2010 WL 6420572, at * 5 (D. OR. Dec. 22, 2010).

This court has twice considered whether a plaintiff may simultaneously pursue a statutory claim for retaliation and a common law claim for wrongful discharge. *See* Hutton v. Jackson Cnty., No. 09-3090-CL, 2010 WL 4906205 (D. Or. Nov. 23, 2010), *aff'd*, -- Fed. Appx. --, 2012 WL 959471 (9th Cir. 2012); Franklin v. Clarke, Civ. No. 10-00382-CL, 2011 WL 4024638, (D. Or. Sept. 9, 2011). First, in Hutton, the court relied on Olsen in rejecting the defendant's argument that the plaintiff's wrongful discharge claim was precluded by the statutory remedies available for his claims brought under 42 U.S.C. § 1983. 2010 SL 4906205, at * 11. However, the court did so only after granting summary judgment on the plaintiff's claims under both 42 U.S.C. § 1983 and ORS § 659A.203. 2010 WL 4906205, at * 4-9. Moreover, as the court found that the plaintiff's wrongful discharge claim failed on the merits, the determination ultimately made no difference in the result.

Nearly a year later, in Franklin, this court was again presented with a summary judgment motion in which the defendant argued the plaintiff's wrongful discharge claim was precluded by his claims for "whistleblowing" under ORS §§ 659A.199 and 659A.203. 2011 WL 4024638, at * 10-11. The court first found that a genuine issue of material fact precluded summary judgment on plaintiff's whistleblower claims. Id., at * 8-10. Next, after reviewing Magistrate Judge Acosta's careful and exacting analysis in Reid and Judge Haggerty's close examination of that opinion in Duran, this court joined the majority of courts in this District in holding that the availability of an adequate statutory remedy under the "whistleblowing" statutes precluded the plaintiff's wrongful discharge claim, and therefore granted summary judgment to the defendant on this claim. Id., at * 11.

This court has again closely examined the sometimes conflicting opinions issued by the courts of this District, and reaffirms its opinion in Franklin. As described above in section III, a

genuine issue of material fact precludes summary judgment on Neighorn's claim under ORS §
659A.199. Because ORS § 659A.199 "provides an adequate (if not better) remedy" than a
wrongful discharge claim, *see* Duran v. Window Prods., Inc., No. CV-10-125-ST, 2010 WL
6420572, at * 5 (D. OR. Dec. 22, 2010), Neighorn's wrongful discharge claim is precluded.
Therefore, Rotech's motion for summary judgment is GRANTED with respect to Neighorn's
claim for wrongful discharge.

## IV. Personnel File

Neighorn's third claim for relief alleges Rotech twice denied him the right to inspect his
personnel file in violation of ORS § 652.750. Neighorn seeks damages for each alleged violation
pursuant to ORS § 652.900(1). Rotech argues it is entitled to summary judgment on this claim
because no private right of action exists for the remedy Neighorn seeks to invoke, and no private
right of action is necessary to carry out the statutory policy because the Commissioner of the
Bureau of Labor and Industries ("BOLI") has the authority to enforce ORS § 652.750.

ORS § 652.750 is part of Oregon's wage claim statutes. The statute requires employers
to make all personnel records used by the employer to evaluate an employee's qualifications "for
employment, promotion, additional compensation or employment termination or other
disciplinary action" available for the employee's inspection within 45 days of an employee's
request, and further requires that in the event of termination, the employer must upon the
employee's request provide the employee a certified copy of his personnel file. OR. REV. STAT.
§ 652.750(2)-(3). An employer who violates ORS § 652.750 may be assessed a civil penalty by
the Commissioner of BOLI not to exceed $1,000. OR. REV. STAT. § 652.900(1); N. Marion
School Dist. No. 15 v. Acstar Ins. Co., 343 Or. 305, 169 P.3d 1224, 1228 & n. 10 (2007) (en

banc) (the authority to assess civil penalties pursuant to ORS § 652.900(1) is one of several enforcement mechanisms available to the BOLI Commissioner in a wage enforcement action).

Neither ORS § 652.750 nor any other statute provides the employee a private right of action for violations by his employer. Neighorn acknowledges this, but argues that that the denial of his right to access his personnel file is "independently actionable" as an act of retaliation and, since the administrative remedy set forth in ORS § 652.900 is not exclusive and does not *preclude* a private right of action, a private right of action should be implied to effectuate the statute's policy. (Pl's Mem. Opp'n Defs' Mot. Summ. J., Dckt. # 53, pp. 35).

Although "an individual has no private remedy for a statutory violation unless the statute expressly provides one," the statute may nevertheless support an implied private right of action in specific circumstances, giving rise to what Oregon courts have variously termed a "statutory tort" or "statutory liability." *Compare* Dunlap v. Dickson, 307 Or. 175, 765 P.2d 203, 203 & n. 3 (1988) ("We prefer to use the term 'statutory liability' in place of the term 'statutory tort.'"), *with* Otterness v. City of Waldport, 130 Or. App. 550, 883 P.2d 228, 230 (1994) (setting forth the elements of a "statutory tort" claim) (*citing* Praegitzer Indus. v. Rollins Burdick Hunter of Or., Inc., 129 Or. App. 628, 880 P.2d 479, 481 (1994)). The court may recognize an implied private right of action only when doing so is necessary to carry out the policy of the statute. Stout v. Citicorp Indus. Credit, Inc., 102 Or. App. 637, 796 P.2d 373, 375 (1990) (internal citations omitted), *rev. den.*, 311 Or. 151, 806 P.2d 129 (1991).

The court need not imply a private right of action to effectuate the policy of ORS § 652.750. The policy of Oregon's wage claim statutes, of which ORS § 652.750 is a part, is "'to aid an employee in the prompt collection of compensation due and to discourage an employer from using its economic superiority as a lever to dissuade an employee from promptly collecting

his agreed compensation.'" Bobadilla-German v. Bear Creek Orchards, Inc., 641 F.3d 391, 398 (9th Cir. 2011) (*quoting* Stout, 796 P.2d at 375). Neighorn does not allege any wage claim in this action. There is no evidence that Rotech has unlawfully withheld compensation due him, nor that it used or attempted to use its position to discourage Neighorn from attempting to collect payment due him. Therefore, implying a private right of action in this case would not advance the policy underlying ORS § 652.750.

Because ORS § 652.750 is silent with regard to private enforcement and an implied private right of action is not necessary to effectuate its policy, Rotech's motion for summary judgment is GRANTED with respect to Neighorn's third claim for relief.

## V. PUNITIVE DAMAGES

Neighorn prays for punitive damages, as available, for each of his claims, and Rotech moves for summary judgment on that request.

For actions alleging violations of ORS § 659A.199, a court "may award" both compensatory and punitive damages. OR. REV. STAT. § 659A.885(3)(a). Under Oregon law, punitive damages are allowed only if the plaintiff proves "by clear and convincing evidence that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others." OR. REV. STAT. § 31.730(1); *see also* Kildow v. Breg, Inc., 796 F.Supp.2d 1295, 1300 (D. Or. 2011) (*citing* OR. REV. STAT. § 31.730(1); Andor v. United Air Lines, Inc., 303 Or. 505, 517, 739 P.2d 18, 25 (1987) (punitive damages "are a penalty for conduct that is culpable by reason of motive, intent, or extraordinary disregard of or indifference to known or highly probable risks to others")). "The Oregon

Supreme Court has clarified that 'malice' means 'nothing more than a wrongful act done intentionally without just cause or excuse.'" Hedum v. Starbucks Corp., 546 F.Supp.2d 1017, 1029 (D. Or. 2008) (*citing* Friendship Auto Sales, Inc. v. Bank of Willamette Valley, 300 Or. 522, 716 P.2d 715, 722 (1986) (internal citation and quotation marks omitted)).

Rotech argues it reached the decision to terminate Neighorn's employment as the result of an objective, methodical and thorough investigation that resulted from Neighorn's own "unsolicited admission that he had falsified patient records," and that the only Rotech employees he alleges treated him poorly or unfairly were not involved in that decision, therefore, he cannot establish that Rotech acted with malice or reckless indifference when discharging him. However, as discussed above, genuine questions of material fact remain about whether Neighorn falsified patient signatures and whether he admitted to Rotech's Compliance investigators that he had done so. If Neighorn's version of the facts is accepted, the fact-finder could find that Rotech terminated Neighorn for reporting what he in good faith believed to be violations of state and federal law. Although it is certainly unclear whether Neighorn will be able to show Rotech acted with malice or reckless and outrageous indifference, that determination is better suited for a properly supported motion before the case is submitted to the jury. Therefore, Rotech's motion for summary judgment is DENIED with respect to Neighorn's prayer for punitive damages.

## CONCLUSION

For the reasons stated above, defendants' motion (#40) for summary judgment is GRANTED with respect to Neighorn claims for retaliation in violation of the FCA, 31 U.S.C. § 3730(h), violation of ORS § 652.750, and common law wrongful discharge, and DENIED with

respect to h claim for retaliation in violation of ORS § 659A.199 and prayer for punitive

damages.

IT IS SO ORDERED.

DATED this _____ day of May, 2012.

MARK D. CLARKE
United States Magistrate Judge